IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| STATE OF MARYLAND | : | |
| | : | |
| (Parties in Interest) | : | |
| | : | |
|     ex rel. | : | |
| | : | |
| MITRA RANGARAJAN | : | |
| 1903 Cranbourne Road | : | |
| Timonium, MD 21093 | : | |
| | : | |
|     Plaintiffs | : | |
| | : | Case No.  1:17-cv-807 |
|     v. | : | |
| | : | |
| JOHNS HOPKINS HEALTH SYSTEM | : | |
| CORP. and JOHNS HOPKINS | : | |
| UNIVERSITY t/a JOHNS HOPKINS | : | |
| MEDICINE | : | |
| 600 N. Wolfe Street | : | |
| Baltimore, MD 21205 | : | |
| | : | |
|     and | : | |
| | : | |
| JOHNS HOPKINS HEALTH | : | |
| SYSTEM CORP. | : | |
| 600 N. Wolfe Street | : | JURY TRIAL DEMANDED |
| Baltimore, MD 21205 | : | |
| | : | |
|     and | : | |
| | : | |
| JOHNS HOPKINS HOSPITAL, INC. | : | |
| 600 N. Wolfe Street | : | |
| Baltimore, MD 21205 | : | |
| | : | |
|     and | : | |
| | : | |
| JOHNS HOPKINS UNIVERSITY | : | |
| 3400 N. Charles Street | : | |
| Baltimore, MD 21218 | : | |
| | : | |
|     Defendants. | : | |

<u>COMPLAINT</u>

On behalf of the United States and the State of Maryland, Plaintiff Mitra Rangarajan (hereinafter referred to as "Relator") brings this action against Defendants Johns Hopkins Health System Corp. and Johns Hopkins University t/a Johns Hopkins Medicine, Johns Hopkins Health System Corp., Johns Hopkins Hospital, Inc., and Johns Hopkins University[1] to recover all damages, civil penalties, and all other recoveries provided for under the Federal False Claims Act and the Maryland False Health Claims Act.

## I.   INTRODUCTION

1.     This is an action to recover damages and civil penalties arising out of Defendants' false and fraudulent billing, records and claims for payment to Medicare, Medicaid and other federal health care programs in connection with fraudulent billing for physicians' services and diagnostic tests and procedures at Johns Hopkins, including at Johns Hopkins clinics specializing in Gastroenterology and Hepatology.

2.     From at least as early as November 2007 when Relator began working at Johns Hopkins and continuing until at least May 2011 when she was constructively discharged (the "relevant time period"), Johns Hopkins Medicine knowingly caused false claims for reimbursement to be submitted to Medicare and other federal health care programs and compromised patient safety.

3.     The first scheme involves fraudulent billing for patient office visits as if the physicians had seen the patients, when in fact the services were performed by non-physician practitioners (NPPs).  Under Medicare billing rules, the physician must see all new patients, and

---

[1]   Referred to collectively throughout this complaint as "Johns Hopkins," "Johns Hopkins Medicine," or "Defendants."

established patients with new problems or complaints, in order to bill for those office visits. Under some circumstances, a physician may bill NPP's services as incident-to the services of the physician, if certain requirements are met, but that rule does not apply to office visits for new patients or established patients with new problems or complaints. Contrary to the Medicare billing rules, Relator and other nurse practitioners at the Johns Hopkins Clinics would routinely handle office visits with new patients, and established patients with new complaints, while the physicians continued to bill the government for those visits as if the physicians had seen the patients. This scheme is discussed more fully in Section VII below.

4.      Johns Hopkins Medicine's fraudulent billing practice caused Medicare, Medicaid and other federal government health care programs to overpay for office visits. Medicare reimburses for patient office visits performed by the physician at 100% of the Physician Fee Schedule amount. Whereas, office visits handled by NPP's are reimbursed at 85% of the Physician Fee Schedule amount. In other words, if the full reimbursement amount were $100, Johns Hopkins would receive $100 for billing under the physician's name, rather than $85 if it had billed correctly under the NPP's name. Further, physicians were incentivized to bill as if they performed the complete office visit because they earned bonuses based on the number of office visits and procedures conducted during a given quarter.

5.      Johns Hopkins Medicine knew that it was improperly billing Medicare. On no fewer than eighteen occasions throughout the relevant time period, Relator raised the billing issue and related patient safety issues with the Chief of the GI Division (Dr. Anthony Kalloo) and/or the Senior Administrative Manager (Tiffany Boldin), responsible for handling all billing issues for the GI Division.

6.      Indeed, on one occasion, in around October 2008, Dr. Kalloo flatly admitted to

Relator that it was more profitable for physicians to bill.  He admitted that only physicians should bill for patient visits and not nurse practitioners because it was more lucrative for physicians to bill.

7.     In addition to improper billing for patient office visits, the second scheme involves false billing for GI diagnostic tests and procedures.  NPPs and unqualified nursing personnel performed invasive procedures and diagnostic tests, including Esophageal manometry, anorectal manometry, pH impedance, upper endoscopy and colonoscopies, unsupervised, but billed Medicare, Medicaid, and other federal health care programs for the tests and procedures as if they had been performed by physicians.  Dr. Kalloo admitted to Relator that training and allowing NPPs to perform colonoscopies and EGDs would give rise to medico-legal issues that would be indefensible. However, he changed his position after meeting a young, Caucasian, blonde NP by the name of Monica VanDongen, and he personally trained her to perform these procedures. Physicians were incentivized to cause Johns Hopkins Medicine to improperly bill for diagnostic tests and procedures in order to get paid more in bonuses.

8.     Upon information and belief, Johns Hopkins Medicine fraudulently billed Medicare for the following diagnostic tests and procedures as discussed more fully in Section VIII below:

- **complicated diagnostic tests** (esophageal manometry, anorectal manometry and pH impedance testing) as if physicians had performed them when in fact the tests were performed by unqualified nurses, nursing assistants and nursing technicians;

- **breath analysis tests** as if a physician had interpreted the test results when in fact a nurse had interpreted the results and recommended the appropriate therapy;

- **colonoscopies and upper endoscopies** as if a physician had performed them when in fact the tests were performed by nurse practitioners and physician assistants who were not authorized to perform colonoscopies;

- **capsule endoscopy tests** as if a physician had interpreted the test results when in

fact fellows and NPs had interpreted the results and identified the abnormalities; and

- **complicated endoscopy procedures** (ERCP tests, EGDs, colonoscopies and endoscopic ultrasounds, endoscopic botulinum toxic injection) as if performed by physicians when in fact they were performed by GI fellows and nurse practitioners including those NPs on a student visa at Johns Hopkins Hospital, while the attending/supervising physicians were not present.

9.      The practice of allowing NPPs to perform invasive procedures, such as upper endoscopies with administering botulinum toxin injection and colonoscopies with polypectomy, banding for GI bleed, for which physicians have to undergo a minimum of six years of training post medical school, puts patients at significant risk.  The potential risks include, but are not limited to, patients requiring additional secondary invasive procedures, false negative pathology, additional imaging studies, an elective procedure leading to inpatient admissions, death and other severe complications leading to sometimes irreversible injury.  While any procedure has risk of complications, physicians have the training and the required skills necessary to recognize and address the complications. Particularly in gastroenterology, the cognitive and technical skill set acquired during six years of the residency and fellowship training, post medical school, adequately prepares an attending gastroenterologist to recognize subtle abnormal pathology such as flat polyps and hemodynamic changes requiring immediate attention. The attending gastroenterologist has the authority to immediately activate surgical intervention for a decompensating patient. For example, if there is evidence of perforation or a bleed which requires surgical intervention, a gastroenterologist has the authority to put an angiocath to release air in the event of a pneumoperitoneum or in some instances of acute bleeding, perform therapeutic endoscopic procedures to ameliorate the situation and stabilize the patient. In contrast, the NPPs by virtue of their scope of practice and hospital privileges lack this authority,

5

and thus, allowing them to perform invasive procedures such as upper endoscopy and colonoscopy puts patients in enormous danger. Each of these risks carries an economic burden to the patient and the healthcare system. Moreover, the practice of allowing NPPs to perform colonoscopy and upper endoscopy with only one-sixth the training of a physician, circumvents the extensive training, credentialing and hospital privilege requirement set forth by the American Council of Graduate Medical Education, American Society of Gastrointestinal Endoscopy and The Residency Review Committee to protect patient safety. The American Society of Gastrointestinal Endoscopy has acknowledged that the medical literature does not support the utilization of NPPs to perform screening or diagnostic colonoscopy with polypectomy, upper endoscopy including administering BOTOX injection and therapeutic endoscopy procedures. Allowing NPPs to perform colonoscopy and upper endoscopy is akin to allowing a flight attendant to fly a plane and in an emergency the flight attendant cannot become Captain Sully who safely landed the plane on the Hudson. Allowing NPPs to perform the aforementioned invasive procedures flies in the face of hundreds of years of medical education, training, credentialing and privileges that have been put in place in this country to protect public safety. In the event of an adverse outcome, the NPP can never become the Captain Sully of GI to manage these adverse events. The NPP who performed the invasive procedures at Johns Hopkins Hospital had a never event. She did not have ACLS (Advanced Cardiovascular Life Support) certification. ACLS is a specialized set of protocols created for medical professionals to use with patients who are experiencing cardiac - related emergencies. Dr. Mullin was called to attend to the never event. He notified the credentialing committee. The NPP continued to perform the procedures. By covering it up and not allowing this case to go forward to give the transparency it requires, Johns Hopkins Medicine is setting the precedence for this level of maleficence to

become commonplace. Medicare and JCHAO (Joint Commission on Accreditation of Hospital Organization) set up regulations for providing care to keep public safe. Courts mandate that hospitals exercise the same degree of care that other similarly situated hospitals exercise; now many hospitals are accredited by Joint Commission on Accreditation of Hospital Organizations, which is a nationwide organization. This court like other courts must consider all JCAHO accredited hospitals to be "similarly situated." None of the other hospitals in Maryland allow NPPs to perform colonoscopy and upper endoscopy.

## II.    JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345.

11.    This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and because Defendants transact business in the District of Maryland.

12.    Venue is proper in the District of Maryland under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Johns Hopkins resides in and/or transacts business in this District.

## III.    PARTIES

### A.    Plaintiffs

13.    The United States is a plaintiff to this action on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and other federally funded health care programs including Medicare, Medicaid, TRICARE, and the Veterans Administration.

14.    Medicare is a government health insurance program for those 65 years or older, and those with certain disabilities.  42 U.S.C. §§ 426, 426A.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), which is part of the United States Department of Health and Human Services ("HHS").

7

15.     TRICARE/CHAMPVA ("TRICARE") is a federally funded program that provides medical benefits to military personnel, their families, retired veterans, and reservists called to duty.  32 C.F.R. § 199 *et seq.*

16.     The Veterans Administration ("VA") is a federally funded and administered program which provides medical benefits to military veterans and their dependents.

17.     The Medicaid Program, 42 U.S.C. § 1396 *et seq.,* is a government health insurance program funded jointly by the federal and state governments.  Each State administers its own Medicaid program, but the State's programs are governed by federal statutes, regulations and guidelines.   The federal portion of States' Medicaid payments, the Federal Medical Assistance Percentage, is based on a State's per capita income compared to the national average. During the relevant time period, the federal portion consisted of a minimum of 50% up to a maximum of roughly 80%.

18.     Throughout the relevant time periods specified herein, Defendants submitted false or fraudulent claims to Medicare, Medicaid and other federal health care programs for the fraudulent conduct alleged herein.

19.     The State of Maryland is a plaintiff in this action.  Throughout the relevant time periods specified herein, Defendants submitted false or fraudulent claims to Maryland Medicaid for the fraudulent conduct alleged herein in Section VIII.

20.     Throughout the relevant time periods specified herein, Defendants submitted false or fraudulent claims to Maryland Medicaid for the fraudulent conduct alleged herein in Section VIII.

21.     Relator Mitra Rangarajan (hereinafter "Relator") is a citizen of the United States and resident of Maryland.  She is a highly accomplished, board-certified nurse practitioner,

nutritionist and diabetes educator.  She has presented her work in the United States and around the world on topics ranging from "Effect of Maillard Reaction on Growth, Patient Safety and the Role of Nurse Practitioners, Intervention for Smoking Cessation, Unknown Perils and Truth Behind Credentialing & Privileges, Nurse Practitioner Scope of Practice Around the World" to mention a few. Relator was a national merit scholar, and she received her Bachelor of Science degree in chemistry, biology and physics from WCC, a highly selective college affiliated to Mount Holyoke College, MA and Madras University in India; her Master of Science in human nutrition, food science and institution management from Oklahoma State University while on a merit and dean scholarship; and her Master of Public Health in health policy and population dynamics from Johns Hopkins University.  In addition, she earned her Bachelor of Science in nursing and Master of Science in nursing degrees from Johns Hopkins University and conducted pain management research as a global health scholar in Australia.  The allegations in this Complaint are based upon information Relator discovered through her work at Johns Hopkins Medicine and through her own personal efforts, observations, and investigation.

### B. <u>Defendants</u>

22.     Defendant Johns Hopkins Medicine (Johns Hopkins Medicine), headquartered in Baltimore, Maryland, is a registered trade name owned by Johns Hopkins Health System, Corp. and John Hopkins University.  Johns Hopkins Medicine was created to unify the school of medicine and health system under one enterprise.  Johns Hopkins Medicine operates a number of different health care entities including six hospitals (including Johns Hopkins Hospital, Inc.), four suburban health care and surgery centers, and the medical school.  Some of the conduct alleged herein took place at three of Johns Hopkins Medicine's suburban health care centers:  the

John Hopkins Health Care Center at Cedar Lane ("Cedar Lane Clinic")[2] located in Columbia, Maryland; the Johns Hopkins Health Care & Surgery Center at Green Spring Station ("Green Spring Clinic") located in Lutherville, Maryland; and the Johns Hopkins Outpatient Center ("J HOC") located in Baltimore, Maryland (collectively referred to herein as "the Clinics," "Johns Hopkins Clinics," or "Johns Hopkins Medicine Clinics").  Johns Hopkins Medicine is named herein as a Defendant, and to the extent the acts of Johns Hopkins Medicine were performed or are otherwise attributable to any subsidiary or affiliate to it, then judgment should be entered against them where appropriate.

23.     Defendant Johns Hopkins Health System Corp. (JHHS) is incorporated in Maryland and has its principal offices in Baltimore, Maryland.  JHHS is named herein as a Defendant, and to the extent the acts of JHHS were performed or are otherwise attributable to any subsidiary or affiliate to it, then judgment should be entered against them where appropriate.

24.     Defendants Johns Hopkins University (JHU) and Johns Hopkins Hospital, Inc. (JHH), both located in Baltimore, Maryland, are also named as Defendants herein.  The physicians involved in the fraudulent conduct alleged herein served as faculty at JHU, Department of Medicine, Division of Gastroenterology & Hepatology and as attending physicians at the Johns Hopkins Hospital, Department of Medicine, Division of Gastroenterology and Hepatology.  The Chief of the Division of Gastroenterology & Hepatology at Johns Hopkins Hospital was and currently remains Dr. Anthony Kalloo. Also, the physicians had hospital privileges at Johns Hopkins Hospital and were on the medical staff of Johns Hopkins Hospital as well.  The NPPs performed the invasive procedures, namely, colonoscopy

---

[2] Relator believes that in approximately 2010, much of the GI practice at Cedar Lane Clinic was transferred to the clinic located at Howard County General Hospital.

and upper endoscopy at the Blalock Endoscopy Center located at the Johns Hospital, in addition to performing these procedures at other endoscopy centers located at other sites. To the extent the acts of JHU or JHH were performed or are otherwise attributable to any subsidiary or affiliate, then judgment should be entered against them where appropriate.

## IV.   THE FEDERAL FALSE CLAIMS ACT AND MARYLAND FALSE HEALTH CLAIMS ACT

25.     The Federal False Claims Act ("FCA") provides, among other things, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the United States for a civil monetary penalty plus treble damages.  31 U.S.C. §§ 3729(a)(1)(A)-(B).

26.     The term "knowingly" means "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. §§ 3729(b)(1)(A)(i)-(iii).  Proof of specific intent to defraud is not required.   31 U.S.C. § 3729(b)(1)(B).

27.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded …."  31 U.S.C. §§ 3729(b)(2)(A)(i)-(ii).

11

28.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

29.     In addition, the FCA provides relief from retaliatory actions:  "Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."  31 U.S.C. § 3730(h)(1).

30.     The relief from retaliation includes reinstatement with the same seniority status, two times back pay plus interest "and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees."  31 U.S.C. § 3730(h)(2).

31.     Maryland has enacted the Maryland False Health Claims Act, Title 2, Subtitle 6, § 2-601 *et seq.*, which is modeled after the Federal FCA, and contains provisions similar to those quoted above.  Relator asserts claims under the Maryland False Claims Act for the state portion of the Medicaid false claims detailed in this complaint in violation of Section 2-607(a).

## V.     THE LAW

### A.     Medicare – Billing and Reimbursement for Health Services

32.     Medicare is a federal health insurance program which provides coverage for people aged 65 and older, the disabled and those with End Stage Renal Disease. The Medicare Program was enacted into law in 1965 by Congress through Title XVIII of the Federal Social Security Act. The Program is managed by the Centers for Medicare and Medicaid Services (CMS), which is a branch of the Department of Health and Human Services.

33.     The Medicare Program includes Part A (hospital insurance), Part B (medical

insurance), Part C (Medicare Advantage Plans) and Part D (prescription drug coverage).

34.     This action specifically involves reimbursement for physicians' services under Medicare Part B and for medical procedures performed in the hospital under Part A.

35.     Medicare Part A reimburses based on Diagnostic Related Group ("DRG") codes under the Prospective Payment System ("PPS").  Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for interim reimbursement to the fiscal intermediaries for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64.   Hospitals submit patient-specific claims for interim payments electronically or via Form CMS-1450 (or UB-04 Form).  These submissions contain notices and certifications which state: "[a]nyone who misrepresents or falsifies essential information requested by this Form may upon conviction be subject to fine and imprisonment under federal and/or state law;" and "any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State Laws."

36.     In addition, as a prerequisite to payment by Medicare, CMS requires hospitals to submit a Medicare cost report, or a Form CMS-2552, annually at the conclusion of the hospital's fiscal year.  The cost report is the final claim that a hospital files with the fiscal intermediary identifying the hospital's costs for services rendered to Medicare beneficiaries and stating the amount of reimbursement the hospital believes to be due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1081 (b)(1).

37.     Each year's cost report covers all the interim requests for reimbursement, such as the CMS-1450 Forms (or UB-04 Forms) used by hospitals, submitted during that cost-reporting year.

38.     Medicare relies upon the cost report to determine whether the hospital is entitled

to reimbursement beyond the interim payments that the hospital has received from Medicare during the course of the year, or whether the hospital was overpaid by Medicare, and consequently, must reimburse Medicare for the excess amounts paid under the program during the course of the year. *See* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

39.     Medicare Part B covers the cost of certain health services, such as the costs of clinic or office visits to physicians or non-physician practitioners (NPPs) such as physician assistants, nurse practitioners and clinical nurse specialists.  42 C.F.R. §§ 410.10(a), 410.20(a).

40.     Thus, when a physician provides services to a patient in a clinic or office, the physician may be reimbursed for his/her services by Medicare Part B.  The physician bills Medicare under his/her national provider identifier (NPI) number which is a unique, 10-digit number assigned by CMS.  When a physician bills under his/her name and NPI number, Medicare reimburses at the rate of 100% of the Physician Fee Schedule amount.

41.     When a NPP sees a patient and provides medical services, Medicare Part B covers the cost of those services.  Medicare may be billed in one of two ways:

1).     The NPP may bill under his/her name and NPI number, but the clinic would then only receive 85% Medicare reimbursement.

2).     Or, if the NPP's services were provided "incident-to" the services of a physician, the physician may bill Medicare under his/her NPI number and receive 100% Medicare reimbursement so long as the "incident-to" criteria/requirements are met.  42 C.F.R. § 410.26(b).  In other words, to receive full reimbursement, the physician may bill under his/her national provider identifier (NPI) number for services provided by a NPP if all the requirements of Medicare incident-to billing are met.

3).     For procedures such as screening and/or diagnostic Colonoscopy with

polypectomy, Upper Endoscopy (EGD), EGD with BOTOX, Medicare does not allow NPPs to perform these procedures. Likewise, for the motility testing such as anorectal manometry and esophageal manometry, Medicare only allows Nurse Practitioners or Physicians to perform these procedures.

### B.     Medicare Incident-to Billing

42.     Medicare has very specific requirements regarding incident-to billing. These can be found in the Medicare Benefit Policy Manual, Chapter 15 – Covered Medical and Other Health Services, § 60.2 (http://www.cms.hhs.gov/Manuals/IOM/list.asp).[3]  Under Medicare Part B, in order for a physician to bill under his or her NPI number and receive full Medicare reimbursement for services performed by a NPP, the NPP's services must be:

- Furnished incident to a physician's professional services (incident to means that the services are an integral, although incidental, part of the physician's personal professional services in the course of diagnosis or treatment of an injury or illness);

- Commonly rendered without charge or included in the physician's bill;

- Of a type commonly furnished in physician's office or clinic (medically appropriate to be provided in the office or clinic setting); and

- Furnished under the physician's direct supervision (physician must be present in the office suite).

Medicare Benefit Policy Manual § 60.1, 60.1A-B.

43.     Moreover, the services performed by a NPP are considered incident-to the physician's service "if there is a physician's service rendered to which the services of such personnel are an incidental part . . . ."  Medicare Benefit Policy Manual § 60.1B. That is, "[s]uch a service . . . could be considered to be incident to when furnished during a course of treatment

---

[3]  The Medicare Carriers Manual, Part 3, Claims Process, Pub. 14-3, § 2050 (http://www.cms.gov/Manuals/PBM/list.asp) also contains the incident-to requirements, but this manual is currently for reference only and has essentially been transferred over to the Medicare Benefit Policy Manual.

where the physician performs *an initial service* and subsequent services of a frequency which reflect his/her active participation in and management of the course of treatment." Medicare Benefit Policy Manual §60.1B (emphasis added).

According to Medicare:

> [T]here must have been a direct, personal, professional service furnished by the physician to *initiate the course of treatment* of which the service being performed by the [NPP] is an incidental part, and there must be subsequent services by the physician of a frequency that reflects the physician's continuing active participation in and management of the course of treatment. In addition the physician must be physically present in the same office suite and be immediately available to render assistance if that becomes necessary.

Medicare Benefit Policy Manual § 60.2.

44.     According to Medicare, therefore, "incident-to" billing does not apply to new patients or established patients with a new problem or complaint because the physician must perform the initial service to initiate a course of treatment or plan of care for the patient. Similarly, for established patients with new problems or complaints, the physician needs to examine the patient and initiate a course of treatment or plan of care for the new problem. The course of treatment or plan of care includes the services or care the patient will need in the future for the patient's health problems.

45.     In other words, in order for the physician to bill for services, all new patients and established patients with new problems or complaints must first be seen by the physician so that the physician can establish the course of treatment for the new patient or new problem. After that, there is a "physician's service rendered to which the services of [any NPPs] are an incidental part" and for subsequent office visits, the patients may be seen by a NPP, and if all the requirements of incident-to billing are met, the physician may bill for the NPP's services under

the physician's NPI number and receive the additional 15% greater reimbursement (than if the NPP had billed directly).

46.     In sum, Medicare incident-to billing does not apply to new patient office visits or established patients being seen for a new problem or complaint.  If the physician bills, the physician must perform the complete office visit; NPPs cannot handle the office visit for a new patient or patient with a new problem because the physician first needs to meet with the patient and establish a plan of care ("a direct, personal, professional service furnished by the physician to initiate the course of treatment").

### C.     Medicare Administrative Contractor Guidance

47.     CMS contracts with a Medicare Administrative Contractors (MACs) throughout the United States to administer and pay Medicare Part B claims within their regions.  Novitas Solutions, Inc. ("Novitas," formerly Highmark) is the current MAC for Maryland (as well as for DE, PA, NJ, and the DC metropolitan area).

48.     In addition to providing claims processing operations, Novitas serves as the primary contact for physicians and provides educational resources to providers.  As part of this educational function, Novitas has provided information regarding how to correctly bill Medicare under the incident-to rules, including, but not limited to the three resources discussed below (i.e., Incident to Service Guidelines, Medicare Report (Dec. 2010), and Frequently Asked Questions: Billing (Part B)).

### 1.     Incident to Service Guidelines

49.      Novitas' *Incident to Service Guidelines* ("the Guidelines") set forth "the Medicare definition of incident to services and the criteria that must be met to properly bill incident to services."

50.     The Guidelines specifically warn that billing incident-to when NPPs performed

initial office visits is "*incorrect billing under the incident to guidelines*." (emphasis added).  The

physician must perform the initial service and  the guidelines state that:

> [t]his includes the history and physical and examination portion of
> the service, not only the treatment plan.  Therefore, it is expected
> that the physician will perform the initial visit on each new patient
> to establish the physician-patient relationship.

(emphasis added).

51.     The Guidelines also give an example of incorrect incident-to billing where the

NPP performs the initial visit with the patient and the supervising physician documents a note in

the medical record such as, "Nurse practitioner performed the history and physical and I was

present for the entire encounter and my treatment plan is as follows……"  Medicare would not

cover this visit performed by the NPP but billed by the physician because the physician must

perform the initial service as required by the law.  *See* Medicare Benefit Policy Manual § 60.1B

("Such a service . . . could be considered to be incident to when furnished during a course of

treatment where the physician performs an initial service and subsequent services of a frequency

which reflect his/her active participation in and management of the course of treatment").

52.     Further, the Guidelines emphasize that incorrect incident-to billing would be

material to Medicare's decision to pay in that Medicare will deny claims for payment if

providers billed NPP performing the initial patient visit as incident-to services.  The Guidelines

emphatically state: "Providers billing initial office visits as incident to when the initial history

and physical is performed by a NPP will have those claims denied . . . ."

## 2.     Medicare Report (Dec. 2010)

53.     In December 2010, as part of its quarterly newsletter for providers called

*Medicare Report*, Highmark noted that it is incorrect billing under the incident-to guidelines if

the medical record documentation does not show evidence of the physician initiating the plan of

care for a new patient.  That is, "[i]f services are rendered to a new patient, there is no course of treatment already initiated by the physician, therefore, the service provided by the NPP may not be billed under the physician's . . . provider number." Pg. 4.  In other words, physicians may not bill incident-to for new patient office visits.

### 3.  Frequently Asked Questions:  Billing (Part B)

54.     As part of *Frequently Asked Questions:  Billing (Part B)*, Novitas addresses the question regarding how to bill if both a physician and NPP see a patient in the office during the same encounter.  The answer states that if the patient is an established patient (i.e., not a new patient or not an established patient with a new problem) and the incident-to billing requirements are met, then the physician may bill under his/her NPI number.  However, if the incident-to requirements are not met then "the service must be billed under the [NPP's] NPI, and payment will be made at the appropriate physician fee schedule payment" (i.e., 85%).

### VI.  Johns Hopkins' Medicare Incident-to Billing Policy

55.     Johns Hopkins Medicine prepared and distributed to Relator and other employees a very detailed, one-page "Medicare Incident-to Decision Tree."  This handout was created by Mary McDermott, Director, Office of Billing Quality Assurance.

56.     The handout presents the incident-to billing requirements in the form of a flow chart decision tree which presents a series of questions and depending on the answer, states, "**Do not Bill Incident-to**" "Bill under the NPP" or "You can bill as an incident to service under the physician's name if all other incident to regulations are met[.]"

57.     For example, for a new patient or consultation, the handout states,

**Do not Bill Incident-to**
Incident-to do not apply to new patients or consultations.  Bill under the NPP

58.     Further, if an established patient has a new problem/complaint, the document

states,

> **Do not Bill Incident-to**
> Bill under the NPP (or have the physician see this patient)

59.      It notes that if all incident-to criteria are not met, then bill under the NPP.  Only if it is "a follow up visit with no new problem identified and initial plan of care was established by the attending" can the physician then bill the NPP's services as incident-to the physician's services.      Thus, even though Johns Hopkins' own internal Medicare incident-to billing requirements were consistent with Medicare's, Johns Hopkins Medicine knowingly or recklessly disregarded them as alleged below.

## VII.   Unlawful Billing for Office Visits and Patient Safety Violations at Johns Hopkins Medicine's Clinics and The Blalock Endoscopy Located at The Johns Hopkins Hospital

### A.   The Johns Hopkins Medicine' Clinics and The Blalock Endoscopy

60.      At the Johns Hopkins Medicine Clinics, physicians, nurse practitioners and staff treat patients with gastrointestinal (GI) and liver diseases.   Their patients often suffer from complex medical problems and frequently travel from a distance to see a Johns Hopkins' doctor. Patients at the Clinics include recipients of Medicare and other federal health care programs.

61.      The GI services provided at the Clinics include diagnosing and treating general GI disorders, inflammatory bowel disease, pancreatic and biliary disease, motility, and functional bowel disease, performing GI motility studies such as anorectal and esophageal manometry, administering IV infusion of Remicade, and performing hydrogen and lactulose breath tests, Capsule Endoscopy study, colonoscopy, upper endoscopy and integrative gastroenterology.   At The Blalock Endoscopy, nurse practitioners performed colonoscopy with polypectomy and upper endoscopy on inpatients admitted to the hospital or outpatients who did not meet the ASA (American Society of Anesthesiologists) criteria to undergo the procedure at the JHOC

endoscopy center because of their high risk status. The Hepatology services include serving patients with a variety of liver diseases and performing liver transplants.

62.     The Chief of the Division of Gastroenterology & Hepatology is Dr. Anthony (Tony) Kalloo.

63.     During the relevant time period, about eight to eleven GI physicians worked at the Clinics, including the following physicians:

> 1.     Dr. Anthony (Tony) Kalloo
> 2.     Dr. Marcia (Mimi) Canto
> 3.     Dr. Patrick Okolo
> 4.     Dr. John Clarke
> 5.     Dr. Mark Lazarev
> 6.     Dr. Gerard Mullin
> 7.     Dr. Vikesh Singh
> 8.     Dr. Ann Marie Lennon[4]
> 9.     Dr. Linda Lee
> 10.    Dr. Sanjay Jagannath[5]
> 11.    Dr. Sergey Kantsevoy[6]
> 12.    Dr. Samuel Giday

64.     Further, about four GI hepatologists worked at the Clinics, including the following physicians:

> 1.     Dr. Admet Gurakar
> 2.     Dr. Esteban Mezey
> 3.     Dr. James Hamilton
> 4.     Dr. Ayman Koteish

65.     In addition, there were about seven non-physician practitioners (NPPs) who provided care in conjunction with the attending physicians.  These NPPs included the following:

---

[4]  This foreign-trained physician was practicing without a Maryland Medical License between 2008 and 2010.
[5]  According to Relator, Dr. Sanjay Jagannath, did not engage in the unlawful practices alleged herein in that he billed correctly and saw, examined and diagnosed new patients and established patients with new problems or complaints.
[6]  In addition, according to Relator, Dr. Sergey Kantsevoy also billed correctly for office visits with new patients/new problems.

Relator, Jae Lee, Monica VanDongen[7], Monica Nandwani[8], Jacqueline Darmody, Nancy Carey-Beaver and Alana Harris[9].  Some of these NPPs were assigned to cover the practices of the GI hepatologists, while Relator and others covered the practices of the GI physicians.

66.     Finally, nursing ancillary staff such as nurse technicians, nursing technicians or nurses also work at the Johns Hopkins Medicine Clinics, such as Nurse Joycella Gillyard, a nursing assistant/technician named Karen and a nurse named Mary Jo.

67.     During her tenure at Johns Hopkins Medicine, Relator, at any one time, covered the practices of several GI physicians including the following:  Drs. Marcia "Mimi" Canto, John Clarke, Vikesh Singh, Mark Lazarev, Anthony Kalloo, Patrick Okolo, Gerard Mullin, Sanjay Jagannath, Sergey Kantsevoy, Samuel Giday, and Christina Ha.

**B.**     **The Typical New Patient/New Problem Office Visit:**

68.     Contrary to the Medicare rules and Johns Hopkins Medicine's own internal policies, Johns Hopkins Medicine routinely fraudulently billed for health services performed at its Clinics.  Again, in order for the physician to bill for a new patient/new problem[10] office visit, the physician must see the patient and perform the entire office visit, including taking the patient's history and doing the physical exam.  If the physician is billing, the NPP cannot

---

[7] Between July 1, 2009 and July 30, 2010, Monica VanDongen, a nurse practitioner, was performing colonoscopy with polypectomy and upper endoscopy under the guise of a NP fellow in a non-accredited NP fellowship program implemented by Dr. Kalloo. Furthermore, she continued to perform procedures after her hospital privileges ended on June 30, 2010. Dr. Mullin and NP Sharon Dudley Brown notified Dr. Brent Petty, the head of patient safety committee, pharmacy and therapeutic committee as well as a voting member of the credentialing committee.
[8] Between July 1, 2010 and June 30, 2010, Monica Nandwani, a nurse practitioner on a student visa, was performing colonoscopy with polypectomy and upper endoscopy under the guise of a NP fellow in an unaccredited NP fellowship program implemented by Dr. Kalloo.
[9] Between July 1, 2009 and June 30, 2010, this NP was seeing hepatology patients in the guise of a NP fellow in a non-accredited NP fellowship program implemented by Dr. Kalloo.
[10] "New patient/new problem" is a shorthand reference used occasionally throughout the complaint to refer to new patients and established patients with new problems or complaints.

perform the office visit because the "incident-to" rules do not apply.  As warned in the Medicare *Incident to Service Guidelines*, the physician must perform the history and physical exam portion of the office visit, not just establish the patient's plan of care in order to bill.  Johns Hopkins Medicine routinely and consistently violated these requirements and billed for physician's services as if the physician had seen the new patient/new problem when in fact the NPP saw the patient and performed many (if not all) of the services for the patient.

69.     Johns Hopkins Medicine typically scheduled approximately 16 patient appointments daily for each physician.  Many of these were often new patients.  In addition, a high percentage of the established patients suffered from new problems or complaints.

70.     For example on Tuesday, January 6, 2009, Dr. Mimi Canto's patient schedule at the Cedar Lane Clinic included 14 patients scheduled to be seen from 8:00 am until 1:40 pm., including six new patients and eight returning patients (approximately five of whom seem to have a new problem or complaint).  So, out of 14 patients scheduled for that day, 11 patients, or almost 80%, were new patients or patients with a new problem, all of which Dr. Canto would need to have seen if she were billing for the office visits.

71.     The typical patient office visit at the Johns Hopkins Medicine Clinics was handled as follows:  First, the patient would call Johns Hopkins Medicine's central scheduling office to make an appointment to see a GI physician or hepatologist.  On the day of the appointment, upon arrival at Green Spring, Cedar Lane or Johns Hopkins Medicine OC, the patient would be registered at the front desk.  The patient would be asked to fill out a Patient Questionnaire and then a technician or medical assistant would take the patient back to an exam room and take their vital signs.

72.     At this point, in order to bill Medicare and other federal health care programs, the

physician should perform the complete initial patient visit, i.e., see the patient, take the patient's history, perform a physical exam, formulate a differential diagnosis and come up with a plan of care.

73.     Instead, frequently at Johns Hopkins Medicine's Clinics, NPPs would handle the appointment by taking the patient's history, performing a physical exam, formulating a differential diagnosis and establishing a plan of care, with the physician providing minimal (if any) services.   Often patients were initially upset that they were being seen by a nurse practitioner because they had made an appointment to see a Johns Hopkins Medicine doctor, often traveling from out of the Baltimore area, and wanted to see the doctor, not a nurse practitioner.

74.     For example, Relator initially saw and evaluated a new patient, K.F., and diagnosed K.F. with having a stone in her pancreatic duct.   Relator referred the patient to Dr. Singh for an ERCP (an endoscopic procedure to remove the stone) evaluation.   The patient was scheduled to see Dr. Singh in around the fall of 2010 for a new patient visit, but instead was again seen by Relator for most of the appointment.   The patient was extremely angry because after waiting for hours to see Dr. Singh, she instead saw Relator, with Dr. Singh only spending five minutes of the appointment with her.   During those five minutes, Dr. Singh did not conduct a physical exam.   After the patient underwent an unsuccessful ERCP, she scheduled an appointment to see a different Johns Hopkins Medicine physician, Dr. Mullin.   Once again instead of seeing the physician, Relator handled the office visit with the patient.

75.     So, as part of the office visit, Relator would routinely review the history of present illness, conduct a physical exam, review the patient's symptoms and systems and discuss her findings from the exam with the patient and her assessment of the patient's condition.

24

76.   Then, Relator would find the physician (if they were at the Clinic) and quickly discuss her diagnosis and plan of treatment with the physician.  The physician would usually (but not always) accompany Relator back into the exam room to meet the patient.

77.   Typically, the physician met with the patient for 5 minutes and did not do any physical examination of the patient, take any of the patient's history or do his/her own analysis as to the medical decision making.  Only when Relator specifically requested that they examine the patient would the physician touch the patient.  The physician routinely relied on Relator's medical decisions regarding the possible diagnoses and treatment options.

78.   For example, Relator handled the office visit for a new patient, M.D., for Dr. Singh in around July/August 2010.  Dr. Singh's interaction with the patient amounted to advising the patient to get an ERCP test and surgery, without any explanation.  In an email to Relator dated August 5, 2010, the confused patient asked, "As Dr. Singh never discussed his findings and went directly to proposing ERCP and surgery, perhaps he found some serious problem (tumor?) which he did not want to discuss."

79.   For example, Relator hardly (if ever) witnessed Dr. Canto touch the patients in order to conduct a physical examination.  Other examples include Drs. Okolo, Lazarev, Mullin, Clarke and Singh routinely visiting with patients for five minutes to relay to the patients the diagnosis and plan of treatment detailed to them by Relator in the hall prior to their entering the patient's room.

80.   Sometimes the physician would not even be at the clinic or would be at the clinic but would not go into the patient's room and Relator would perform the entire new patient office visit.  For example, it was common for Dr. Patrick Okolo to not even be in the clinic for the first couple of patients on Tuesdays, but would still bill for these office visits as if he had seen the

patients.  Relator would see these patients on her own but Dr. Okolo would bill for the office visits.

81.    Another example is Dr. Mullin was barred from seeing new patients, and he requested Relator see any new patients scheduled or waiting to be scheduled. Relator saw the patients, but Dr. Mullin billed as if he saw the patients.

82.    Another example is on approximately April 13, 2009, Relator saw all of Dr. Canto's patients scheduled for that day because Dr. Canto was home sick.  Dr. Canto wanted to bill for the patient visits as if she herself had met with the patients, but Relator objected.  Upon information and belief, Dr. Canto still billed for all the patient office visits that day.

83.    For example, on January 19, 2011, Dr. Mullin was absconding from clinic and Relator saw patients scheduled to see him. The division assistant administrator, Ms. Tiffany Boldin, did not permit Relator to bill for the patient visits. Dr. Mullin still billed for the patient as if he saw the patient although he was physically absent from clinic and did not see the patients.

84.    An example of the fraudulent scenario where the physician is at the clinic, but does not go into the patient's exam room is Dr. Kalloo's practice.  While covering his practice, it is Relator's estimation that Dr. Kalloo only met with patients face-to-face a handful of times.  He relied on Relator to conduct the office visit but continued to bill for the visits.  As the Chief of the Division of Gastroenterology & Hepatology, Dr. Kalloo told Relator that he had other important matters that needed his attention and that it was Relator's duty to see the patient, evaluate their medical condition and arrive at the diagnosis.  Dr. Kalloo was often the first to leave the Clinics, hardly ever staying past 4 pm even though the last patient was normally scheduled at 4:40 pm.  During one of the handful of times Relator witnessed Dr. Kalloo actually meeting with a patient—after Relator had seen, examined, and evaluated the patient, he angrily

stated to the patient who had travelled from New Jersey to see him (paraphrasing):

> You can't expect me to see you and spend my time listening to your story, I am very busy and have more important things to do. The NP has already seen you and done that. Follow up with her. If you want an ERCP, then one of us will do the procedure.

85.     Dr. Kalloo has admitted that he bills for patients when the NP handles the entire office visit.  In a meeting with Relator and the manager of Human Resources, Judith Kimball, in January 2011, Relator stated that often when she covered the practice of Dr. Kalloo he did not show up at the clinic or if he showed up was too busy on the phone, so she handled the patients on her own, but Dr. Kalloo still billed for the office visits.  When asked if this were true, Dr. Kalloo responded in essence "yes, when the NP sees the patient we [physicians] bill."

86.     After the office visit of the new patient/new problem, Relator would dictate the Clinic Note documenting the patient encounter.  The Clinic Note is a very detailed document listing, among other things, the following:  Reason for Visit, History of Present Illness, Major Findings, Assessments, Problems/Diagnoses, Plans, and Attending Addendum.  It also lists the names of who dictated the note and electronically signed the Note.  The physician would review the Clinic Note, sometimes revise it and add an addendum, and then sign off on it electronically. Relator had no control on the bills the physicians generated. Relator did not see the edits a physician made to the dictated notes nor the level at which the physician billed. For example, Dr. Mullin consistently billed at a higher code than what was truly warranted. As a result, the billing department often contacted Relator to do an addendum to justify the level at which Dr. Mullin billed. Relator refused.

87.     Sometime after the physician signed the Clinic Note, the physician would log onto Johns Hopkins Medicine's billing system, TAP, select a diagnosis and billing codes.  The physician's NPI number was already in the system.  There was *not* a separate billing code for

incident-to billing; the billing department would generate the bill based on who signed the Clinic Note. Johns Hopkins Medicine's billing department would then bill third party payers, including fraudulently bill the federal health care programs, for the new patient's visit as if the physician had personally performed the services.

      **C.**      <u>Johns Hopkins Medicine's Improper Billing and Patient Safety Violations for Physician Services at Clinics Was Widespread and Frequent</u>

88.      It is Relator's belief that Johns Hopkins Medicine Medicine's improper billing for physician's services extended to almost all the physicians practicing at the Johns Hopkins Medicine Clinics, including the hepatology physicians. NPPs throughout the Johns Hopkins Medicine referred to themselves as "invisible providers," meaning they were not visible to the payer.

89.      At a meeting of NPPs on or around October 2009, the hepatology NPPs (Jae Lee, Jacqueline Darmody and Nancy Carey-Beaver) reported to Relator and the other NPPs that the hepatology physicians incorrectly bill when the NPPs had seen the patients.

90.      As one of the hepatology NPPs (Ms. Jae Lee) casually mentioned to Relator in the Spring of 2008, to paraphrase, "Mitra, you know they are cheating. We are seeing the patients and they are billing. This is cheating." Despite Relator's request for her to report the billing fraud, the NPP refused, expressing fear over losing her job.

91.      Fraudulent billing by physicians was discussed and raised by all of the GI NPPs in a memo to the head of the Division, Dr. Kalloo. On November 3, 2008, the GI NPPs sent Dr. Kalloo, a memo which, among other things, raised the issue that the NPPs were seeing patients but physicians were still billing. Entitled "Wish List" and apparently prepared at the request of Dr. Kalloo, it very clearly stated that some physicians have the NPPs see half or even *all* of their scheduled patient appointments:

> Issues: a) Currently different providers are using APPs [Advanced Practice Providers, i.e., nurse practitioners] differently, for example, seeing half of patients scheduled that day, seeing all patients on schedule, etc.

It goes on to state that because some physicians do not like to dictate, they have the NPP see all their patients so the NPP can dictate the Clinic Note after the patient visit, "but the attending [physician] bills for the visit."

92.     In terms of the frequency of improper billing, for example, on Wednesday, January 5, 2011 at the Green Spring Clinic, the staff daily schedule showed approximately 14 patient appointments for Dr. Mullin from 8:00 am until 4:30 pm.   However, as noted in a scheduling email, Relator herself was scheduled to see eight patients for Dr. Mullin, two of whom were clearly new patients.   One of the new patients was a 79 year-old woman experiencing complications secondary to gastric cancer.   In fact, Relator ended up seeing most of Dr. Mullin's patients on that day, beyond the eight patients originally assigned to her.

93.     Upon information and belief, Dr. Mullin billed for all of these patients as if he had performed their office visit.   This was incorrect and fraudulent as to the new patients/new problems because he had only performed a portion of the office visit, with Relator handling most of the services for these patients.

94.     It was typical for Dr. Mullin to have approximately 16 patients a day, with Relator covering many of his patients and Dr. Mullin himself only meeting with about 4-5 patients and many times not meeting any patients at all. Dr. Mullin was usually busy writing his book chapter.   Furthermore, in 2010, Dr. Mullin was barred from seeing new patients, and he requested Relator to see the new patients and transfer the bill. The division's senior administrative assistant manager, Tiffany Boldin allowed this practice to continue for the duration of Relator's employment at Johns Hopkins Hospital.

95.     Further, by way of example, Dr. Clarke would schedule approximately 16-18 patients on the days he was seeing patients at the Green Spring Clinic.  Relator would typically see about half of his patients, including new patients and established patients with new complaints, but upon information and belief, Dr. Clarke would still bill for these patients.  In addition, Dr. Clarke would destroy Relator's handwritten Johns Hopkins Medicine approved progress notes, which is a Johns Hopkins Medicine legal medical document for patients, thus eliminating any evidence of Relator's encounter with the patient.  It is Relator's belief that this improper billing for physician services extends to Johns Hopkins Medicine departments beyond the Division of Gastroenterology & Hepatology.  In particular, Relator believes that physicians in Johns Hopkins Medicine's Pediatric Surgery Department improperly billed for outpatient office visits at Johns Hopkins Medicine OC.  NPPs routinely handled pediatric patient office visits while physicians billed for those visits as if they had seen the patients.

D.     **Johns Hopkins Medicine and its Physicians Financially Benefitted from the Fraudulent Medicare Billing and Patient Safety Violations**

96.     Johns Hopkins Medicine, through its Clinics, received enhanced reimbursement from Medicare (100% rather than 85%) by improperly billing for office visit services performed by NPPs as if they were in fact performed by physicians.

97.     Further, Johns Hopkins Medicine incentivized its physicians to fraudulently bill for office visits through its compensation plan.  Physicians were incentivized to bill for office visits they did not perform because their compensation was based in part on the number of procedures and visits they could conduct.

98.     At Johns Hopkins Medicine, physicians are paid a salary plus a quarterly bonus based on relative value units (RVUs) which are a way to calculate compensation by using a set formula tied to various physician services.  Different office visits and procedures are assigned

30

different Work RVU values, such as a screening colonoscopy (Work RVU of 3.56), a new office visit level 5 (Work RVU of 3.17), a new office visit level 4 (Work RVU of 2.43), a new office visit level 3 (Work RVU of 1.42) and a return office visit level 5 (Work RVU of 2.11).  Bonuses were calculated based on Work RVU's.  Thus, Johns Hopkins Medicine physicians were incentivized to improperly bill for new patient office visits conducted by NPPs in order to increase their RVUs and their quarterly bonuses.

### E.  Johns Hopkins Medicine Did Not Apply for NPI Numbers for Most of its NPPs Because Physicians Always Billed

99.     Johns Hopkins Medicine did not even obtain NPI numbers for most of its nurse practitioners.  Johns Hopkins Medicine did not require NP's to have an NPI number since the NP's were not billing.  So even if Johns Hopkins Medicine had wanted to bill correctly under the nurse practitioner's NPI for new patient/new problem office visits when the nurse practitioner saw the patients, it would not be able to because many of the NPP's did not have their own numbers under which to submit bills.  Relator did on her own volition apply for and receive an NPI from CMS.  However, she never used it to bill when covering the practices of the GI physicians.

### F.  Physicians Attempted to Cover-Up Their Unlawful Conduct

100.    Johns Hopkins Medicine and the GI physicians knew of the billing rules and as a result, attempted to cover up the unlawful practice of the NPPs seeing patients while the physicians billed.

101.    The physicians employed the following tactics to cover up the fact that the NPPs handled the office visits of many of their new patients/new problems:  1) Physician's false "Attending Addendum" on the Clinic Note; 2) Physicians having NPPs dictate the Clinic Note under their dictation number; and 3) Physicians falsifying Clinic Notes or asking NPPs to falsify

the Clinic Notes under duress.

102.    Physician's false "Attending Addendum" on the Clinic Note:    Before electronically signing the Clinic Note, almost all physicians add an "Attending Addendum" to the end of it.  Many of these addendums were false in that they claim to have seen and examined the patient when in fact Relator performed most (if not all) of the patient visit.

103.    Some examples of false Attending Addendums from Relator's evidence:

- Dr. Mimi Canto attested, "I saw and evaluated the patient" for a new patient office visit on September 28, 2009, of a 67 year-old woman complaining of "epigastric fullness, increased belching and constipation" when in fact Relator handled the patient visit.

- Dr. Patrick Okolo attested  "I performed a history and physical exam of the patient and discussed the management with the resident / clinical fellow. . . ." for a new patient office visit on November 3, 2009 of a 52 year-old woman requiring dilation for possible pharyngeal and esophageal stricture when in fact Relator handled the patient visit.

104.    Or, the physicians often added a more general Attending Addendum such as the following which was often false or fraudulent because Relator, and not the physician, had seen and evaluated the patient:

- Dr. Lazarev attested, "I have seen and examined the patient and agree with the assessment plan as outlined by Mitra Rangarajan."

- Dr. Okolo attested, "I saw and evaluated the patient.  I have reviewed the above note and have made any necessary edits or additions.  Additional comments are will proceed as outlined above."

105.   <u>Physicians having NPPs dictate the Clinic Note under their dictation number</u>: This is suspect because by dictating under the physician's number rather than their own, the NPP's name is completely erased from the Clinic Note.  The NPP's name will not appear at the end of the Note as the person who dictated nor at the beginning as the secondary provider.

106.   Drs. Lazarev, Okolo, Canto, Kalloo and Singh insisted during various times throughout the relevant time period that Relator dictate under their numbers.  For example, on July 9, 2010, Dr. Singh emailed Relator to use his dictation number:  "For future reference, my code for dictations is 267813."  This way, it was less obvious in reviewing the Clinic Note that the NPP had handled most of the patient office visit while the physicians improperly billed.

107.   In addition, Dr. John Clarke instructed Relator to dictate under his dictation number (so her name does not appear on the Clinic Notes).  Relator did this for a few patients, but then Dr. Clarke shifted the way he handled patients.  Relator would meet with the patient, take extensive notes about the patient's medical history and her findings from a complete physical exam of the patient.  Dr. Clarke would then take Relator's notes and go in to see the patient, but not discuss the patient's history or perform a physical exam, and after the visit, he would do the dictation himself and destroy Relator's handwritten notes of the patient visit which were written on a Johns Hopkins Medicine-approved progress note sheet.  Relator brought the practices of Dr. Clarke to the attention of the Clinical Director of the GI Department, Dr. Linda Lee, and Relator was subsequently removed from covering Dr. Clarke's practice.

108.   <u>Physicians falsifying Clinic Notes or asking NPPs to falsify the Clinic Note under duress</u>:  For example, Relator covered Dr. Lazarev's practice for approximately four and a half months in 2010 (July - mid-November) until she was removed from his practice for refusing to falsify information.  Relator dictated the Clinic Notes for Dr. Lazarev's patients that she had

seen.  In the Notes, she only mentioned Dr. Lazarev in the portions of the exam in which he participated.  She was asked to change the Notes and falsely state that Dr. Lazarev had been present during the entire appointment.  Dr. Lazarev asked her to add an attestation stating that the patient was seen and examined in the presence of Dr. Mark Lazarev.  Relator changed one Note and then refused to change the others.  She was then removed from covering his practice.

109.    In addition to billing for new patient/new problem office visits essentially performed by Relator, Dr. Mullin also overbilled Medicare for more time than was actually spent face-to-face with the patient.  In order to bill for "prolonged service" (CPT 99354), the physician must have spent at least 75 total minutes in face-to-face consultation with the patient and there must be ample justification for this in the medical record.  In order to justify the billing, Dr. Mullin required, under duress, that Relator include in the calculation of the total time spent, the time the patient was waiting for the appointment as well as the time it took Relator to dictate the Clinic Note.  This is a violation of the Medicare billing rules and would have caused Medicare to pay more in reimbursement for prolonged services which were never actually provided.

### G.    Johns Hopkins Medicine Knowingly Submitted False Claims for Medicare and Other Federal Healthcare Program Reimbursement

#### 1.    Johns Hopkins Medicine Knew or Recklessly Disregarded the Billing Rules and Patient Safety Violations

110.    As a Medicare provider serving Medicare beneficiaries, Johns Hopkins Medicine was required to know the laws, regulations and rules governing Medicare and specifically billing Medicare for claims to get reimbursed.

111.    Johns Hopkins' own Medicare Incident-to Decision Tree, *see supra* Section VI, distributed to its employees clearly states that for new patients or patients with new problems or complaints, if the NPP saw the patient, the provider should bill under the NPP.  Physicians billing for NPP's services as incident-to do not apply to services provided to new patients/new

problem or complaint.

112.    Further, Highmark (now known as Novitas), the Medicare administrative contractor for Maryland, also provided training to Johns Hopkins Medicine's employees regarding the incident-to billing requirements.

113.    One of these trainings occurred by teleconference on November 10, 2010 from 2-3 pm.  In the PowerPoint presentation accompanying the teleconference, Highmark noted that there is a lot of interest in Medicare incident-to billing because it allows providers to be "[p]aid at the full physician fee schedule amount" whereas "Non-Physician Practitioner services are usually allowed at 85% of the Medicare Physician Fee Schedule." Pg. 3.

114.    In the presentation, Highmark noted that the course of treatment for the patient must have been initiated by the physician in order for subsequent services by a NPP to qualify as incident-to and that the documentation must "[s]how [the] physician's initiation and continued involvement in treatment." Pgs. 6-7.

115.    It was the Johns Hopkins Clinics and Johns Hopkins Hospital's practice to bill Medicare without regard to the incident-to rules.  From approximately November 2007 until August 2009, Relator did not even have an NPI number to properly bill for new patients that she had seen on her own.  Ms. Tiffany Boldin, Senior Administrative Manager, and Ms. Lisa Bach, Office Manager, instructed Relator that Johns Hopkins Medicine would apply for her NPI number if they felt it were necessary, but they did not because Relator would not be billing for any patients seen.

## 2.    Relator Reported the Unlawful Billing and Patient Safety Violations to Higher Authorities at Johns Hopkins Medicine

116.    In addition to Johns Hopkins' obligation to know the Medicare billing requirements, Relator consistently reported the improper Medicare billing to Johns Hopkins

Medicine, to no avail.  Starting as early as her job interview in July 2007 and continuing until her constructive discharge in May 2011, Relator continually and persistently raised the issue of fraudulent Medicare billing for services provided by NPPs.

117.    Throughout the relevant time period, Relator alerted numerous Johns Hopkins Medicine employees regarding the fraudulent billing practices of Johns Hopkins Medicine and physicians.  She alerted those responsible for billing within the Johns Hopkins GI division, Dr. Kalloo, and Ms. Boldin, the Senior Administrative Manager.  As the Senior Administrative Manager (Departments of Gastroenterology and Hematology, Johns Hopkins School of Medicine), Ms. Boldin reports directly to Dr. Kalloo and her job responsibilities include overseeing the daily operations of the Johns Hopkins Medicine Clinics, handling the division's budget and ensuring that the practicing providers adhere to the laws, regulations and rules governing the practice.  All practicing providers were instructed to bring any billing issue to her notice.

118.    In addition, Relator alerted employees of the following Johns Hopkins Medicine divisions that Johns Hopkins Medicine was improperly billing for NPP's services:  the Office of Institutional Equity, Human Resources and Billing and Compliance, Johns Hopkins Hospital risk management and regulatory affairs department.

119.    Johns Hopkins Medicine knew or recklessly disregarded that it was improperly billing the government and disregarded multiple patient safety violations.  On no fewer than eighteen occasions, Relator raised the issue with employees of Johns Hopkins Medicine, including, without limitation during the following meetings or communications:

- **July 2007**:  At Relator's job interview for the position of nurse practitioner at the Johns Hopkins Medicine Clinics, Relator asked Ms. Boldin about how Johns Hopkins Medicine bills for nurse practitioner's services.  Ms. Boldin stated that she did not know and would look into it.

36

- **Around August/September 2007**:  During a phone conversation with Ms. Boldin regarding Relator's potential salary, Relator again asked Ms. Boldin how Johns Hopkins Medicine was billing for nurse practitioner's services, in particularly the incident-to rules, and Ms. Boldin again indicated that she was unaware how the GI Division was billing.

- **Around November/December 2007**:   When Relator began working at Johns Hopkins Medicine, she met with Sharon Dudley Brown, a GI nurse practitioner fellow, at Ross Coffee House in Baltimore.  Among other things, Relator expressed her concern as to how all of the NP's are not billing and Dudley Brown agreed with Relator and said she would raise the billing issue with Dr. Kalloo, the head of the division.

- **December 2007:**  Relator met with Dr. Kalloo in an in-person meeting in his office in which Relator asked about NP's billing for patient visits and Dr. Kalloo answered that physicians would be billing.

- **February 2008**:   During an in-person meeting between Relator and Ms. Boldin, Relator asked why the doctors are billing for patients who Relator sees, examines, evaluates and diagnoses.  *Relator clearly tells Ms. Boldin that this was wrong.*  Ms. Boldin responded that the patients come to see a physician and that is why NPs do not bill.

- **March 2008**:   During a meeting between the GI nurse practitioners and Sharon Dudley Brown, they discussed, among other things, the issue of physicians billing for NPs' services.  It was decided that Dudley Brown would arrange a meeting with Dr. Kalloo to raise this issue.  It is Relator's belief that Ms. Dudley Brown did in fact raise the unlawful billing issue with Dr. Kalloo, but that no changes were made.

- **March 2008:**  Biopsy specimens which Dr. Ookolo took of a patient who had Cholangiocarcinoma (cancer of the bile duct) were lost. A week later in March 2008, Dr. Canto was also missing samples from the procedures she performed at Johns Hopkins Outpatient Clinic (JHOC). A few days later, Ms. Boldin told me that I should no longer convey messages pertaining to missing pathology report, specimen, or errors via email. She asked if I already reported these incidents to safety net, and I said no. She warned me that reporting to safety net would have its own consequences. Such incidents, in which samples were lost or misplaced occurred frequently.

- **March 2008:**   In a meeting in Ms. Boldin's office with Ms. Boldin, Ms. Bach and Relator present, Relator again raised her concern that physicians were improperly billing for NP's services.  Ms. Boldin stated that if Relator continued to repeatedly bring these billing concerns to Ms. Boldin or any other official at Johns Hopkins Medicine, then Relator would be jeopardizing her job.

- **March 2008:**  Biopsy specimens which Dr. Okolo took of a patient who had

Cholangiocarcinoma (cancer of the bile duct) were lost.

- **May 2008**: Relator met with Dr. Kalloo in person to discuss a number of topics including improper physician billing. Relator asked Dr. Kalloo if he was aware of who was billing for nurse practitioner's services. He stated that the physicians bill. Relator then asked if the physicians adhered to the "incident-to" billing rules to which he claimed that he did not know what "incident-to" billing meant. During the same meeting, Dr. Kalloo informed Relator that there are medico-legal issues pertaining to training and allowing NPs to perform colonoscopy and EGD. Furthermore, he stated that he would jeopardize his medical license if he permitted NPs to perform endoscopy procedures, including EGD and colonoscopy.

- **August 2008:** Relator could not find biopsy results of Dr. Kantsevoy's patients who underwent procedures, and she notified Dr. Kantsevoy. Dr. Kantsevoy informed Relator that he was aware of the issue and that pathology could not find the report.

- **September 2008:** Relator and NP Sharon Dudley Brown met with Dr. Kalloo. During this meeting, NP Sharon Dudley Brown advocated for NPs to perform colonoscopy and EGD and requested Dr. Kalloo allow Relator to get trained to do the procedures. Again, Dr. Kalloo expressed medico-legal issues with respect to training and allowing NPs to perform EGD and colonoscopy. In this meeting, NP Sharon Dudley Brown further advocated for Relator and informed Dr. Kalloo that NPs should not be disseminating biopsy results and taking all the calls for the physicians.

- **October 2008**: At a meeting between the GI nurse practitioners and Dr. Kalloo, Dr. Kalloo admitted that only physicians can bill for patient visits and not nurse practitioners because *it is more lucrative for physicians to bill*. Dr. Kalloo essentially stated that the revenue generated by nurse practitioners is very low despite the indirect revenue generated by referring patients for procedures, imaging studies and lab tests at Johns Hopkins Medicine.

- **About March/April 2009**: During an in-person meeting with Ms. Boldin and Lisa Bach, Relator again informed Ms. Boldin that physicians billing for Relator's services is wrong and Relator specifically mentioned her concerns with Dr. Mimi Canto's office practice with multiple patient safety, HIPPA violations and Dr. Canto improperly billing for patients.

- **April 2009**: Relator raises unlawful billing practices with the Human Resources Director, Ron Bassener, in an in-person meeting.

- **About July/August 2009**: Again, during an in-person meeting with Ms. Boldin, Relator raised the issue of fraudulent billing by the physicians. In essence, Relator told Ms. Boldin, ***Please be advised that what you are doing is considered fraud***.

- **October 2009**: During a meeting with Dr. Kalloo and Dudley Brown, Relator again brought up the incident-to billing issues, HIPPA violations, patient safety violations

including but not limited to: standard of care deviations, missing biopsy and other test results, Dr. Canto's refusal to call patients and notify them of their biopsy results and stated that she is very concerned that the incident-to rules are not being followed properly.

- **October 2009**:  Soon after the above meeting, Relator met with Ms. Bach and Ms. Boldin in Ms. Boldin's office to discuss complaints about Dr. Canto's practice. During the meeting, Ms. Boldin told Relator that NP's not billing for patients seen was standard practice at Johns Hopkins Medicine and if Relator did not like this, she should seek another job opportunity elsewhere.  Relator warned Ms. Boldin that if Ms. Boldin continues to support Dr. Kalloo and the other physicians in all their unlawful practices, including fraudulent billing, Ms. Boldin could seriously be jeopardizing her own job.   Ms. Boldin then instructed Relator to keep confidential the discussion at the meeting.

- **Nov. 2009**:   Johns Hopkins Medicine Billing Specialist, Trina Ramsey, trained Relator to use the billing system known as TAP.  Relator confirmed with Ms. Ramsey that if Relator sees, examines, evaluates the patient and dictates the note, then Relator should rightfully be allowed to bill for the visit. She clearly explained that an attending physician merely coming into the exam room and shaking hands with the patient, does not constitute a billable visit. According to Ms. Ramsey, the physicians, Ms. Boldin and Dr. Kalloo were fully aware of this.

- **January 2010-June 2010**: Relator requested Dr. Kalloo be her mentor for the DNP (Doctor of Nurse Practitioner), and he declined. Instead, he immediately summoned NP Monica VanDongen to a meeting and asked her to apply for the DNP program and offered to be her mentor. Relator was interviewed for the DNP program and was accepted without any reservations. Dr. Mullin agreed to be Relator's mentor.

- **July 16, 2010**:  While discussing a number of patient safety issues with Dr. Kalloo during a face-to-face meeting, Relator again expressed her concern that the incident-to billing rules were not being followed and physicians were improperly billing for the services of NP's.  In addition, Relator raised concerns that NPPs were being trained to perform medical procedures independently, even though this was against the law and violated incident-to billing rules.

- **About August 2010**:  Relator raised the improper physician billing issue with the Johns Hopkins Medicine Department of Medicine's Senior Coding Specialist, Cheryl Stonebraker, in an e-mail. Relator raised the unlawful action of Dr. Clarke shredding Relator's hand written progress notes with Dr. Linda Lee. Shortly after reporting to Dr. Lee, Relator was removed from covering Dr. Clarke's practice. Relator began the DNP (Doctoral of Nurse Practitioner Program), and she was asked to use her vacation time to attend classes while as per NP Sharon Dudley Brown, NP Monica VanDongen was paid to attend classes for the same DNP program

- **September 13, 2010**:  Relator raised the improper billing and patient safety issues

directly with Allison Boyle of the Johns Hopkins University Office of Institutional
Equity. Ms. Boyle asked Relator if she had discussed these issues with Dr. Kalloo to
which Relator responded that she had, but to no avail. Ms. Boyle asked if Relator had
disclosed this to the compliance department and Relator responded that she had not
and asked Ms. Boyle how and if that should be done. Ms. Boldin never responded to
Relator's inquiry. Also in this meeting with Ms. Boyle, Relator raised the improper
billing of nurse practitioners, Monica VanDongen, Monica Nandwani, and Sharon
Dudley Brown, performing colonoscopies and related dangers to patients, *see*
discussion below at Section VIII.C. Specifically, Relator told Ms. Boyle that Dr.
Kalloo—who had once told Relator that he would jeopardize his license if he allowed
NPPs to perform colonoscopy and endoscopy—suddenly decided to train NP Monica
VanDongen after meeting her. Ms. Boyle acknowledged to Relator that she is aware
of Dr. Kalloo's preference for young, White, Caucasian women. Relator specifically
told Ms. Boyle that nurse practitioner, Monica Nandwani, was performing all of these
duties while on a student visa and NP Monica VanDongen performed procedures
after her privileges ended and Dr. Mullin and NP Sharon Dudley-Brown reported this
to the credentialing committee. Relator informed Ms. Boyle that NPs were not
permitted to perform these procedures and compared the practice of NP Monica
VanDongen performing colonoscopy on the indigent Baltimore city residents to the
Tuskegee study. Relator reported to Ms. Boyle about missing biopsy specimens,
health disparity, billing violations, losing biopsy samples, and Dr. Canto's secretary
throwing the pathology report in the recycle bin for shredding since Dr. Canto did not
wish to receive these reports. Relator particularly discussed the multiple patient safety
violations and HIPPA violations in Dr. Canto's practice, in particular Dr. Canto not
even disseminating biopsy results of patients who underwent procedures in her hands
and of a patient with adenocarcinoma who never received his results from Dr. Canto
whose, but for Relator, that patient would never have received his results at all. Dr.
Canto had performed the procedure on these patients even prior to Relator beginning
her employment in the GI division, and Dr. Canto failed to notify the patients of their
biopsy results and Relator did. Ms. Boyle was very curious about Dr. Canto's defense
should she be a subject of any malpractice suit. Ms. Boyle asked Relator additional
details about the billing violations and Relator reported to Ms. Boyle about Dr. Clarke
shredding Relator's handwritten progress notes. Relator reported to Ms. Boyle that
she covered the practice of several physicians, a minimum of five at any given time
and that Relator was expected to see two patients in adjacent exam rooms at the same
time and take the calls of all physicians. Relator also reported to Ms. Boyle about the
exodus of several GI physicians after the investigation of Dr. Kalloo in the "Pentax
Scandal." Relator also informed Ms. Boyle about Dr. Ann Marie O'Brien Lennon
practicing without a Maryland Medical License, see discussion below at Section
VIII.D.2.

Shortly after the meeting with Ms. Boyle, the Billing and Compliance Department
notified Relator that they would be auditing her billing, i.e., the Clinic Notes she
dictated.

- **<u>September 21, 2010:</u>** On the morning of September 21, 2010, Relator left a message

for the Legal department head of risk management, Ms. Meg Garrett at Johns Hopkins Hospital. Relator later spoke to Ms. Nancy Gregor who contacted patients and related to Ms. Gregor Relator's meeting with Ms. Allison Boyle. Relator clarified with Ms. Gregor that only providers performing the procedures are permitted to disseminate the pathology results and conveying results via email constituted a HIPPA violation. Relator urged Ms. Gregor to speak to Ms. Boyle. Relator sent an email thanking Ms. Gregor.

- **From approximately September 2010 through May 2011**:  Relator raised the multiple patient safety violations in Dr. Mullin's practice with Dr. Linda Lee. During the GI retreat, Dr. Kalloo informed the attendees that since the GI society (ASGE) had not booted him out for training the NPPs to perform Colonoscopy and Upper Endoscopy, he had concluded that they endorse NPPs to perform these procedures. Several physicians, including the GI-MD fellowship director Dr. Giardello, expressed concerns that GI medical fellows will not be able to get the required training since the cases were being diverted to the NPs. Dr. Kalloo dismissed this concern and brushed it off. He told everyone that this is the future of GI. In September 2010, the Director of the DNP program, Dr. Mary Terhaar commended Relator's Capstone Project Proposal as "fascinating" and acknowledged that it was cutting edge. In "October 2010, the Director of the DNP program informed Relator that Relator was being discriminated against and offered to accompany Relator to the Office of Institutional Equity.  In November 2010, Relator requested a follow up meeting with Ms. Allison Boyle. In that follow up meeting, Relator relayed to Ms. Boyle the intense retaliation she was being subjected to including being singled out, scrutinized, harassed, retaliated, discriminated, in the GI division as well as in the DNP program, billing audits, Ms. Boyle acknowledged to Relator that was being retaliated against and that she would address it.

- **From approximately September 2010 through May 2011**:  Relator received numerous harassing emails regarding various physicians' billing from Ms. Boldin as well as the Billing and Compliance Department requesting her to change the Clinic Note to support the physicians' billing.  On many occasions, she refused to add an addendum, as she could not support the statement that she was asked to write. Relator was also harassed, discriminated and ultimately dismissed from the DNP (Doctor of Nurse Practitioner) program.

- **November 2010**:   Billing and coding specialist Mark James confirmed to Relator that Dr. Mullin should not bill for patients Relator saw and examined.  James sent an email to Dr. Mullin and Relator stating that Relator should bill for the patient visits handled by Relator.  Further, In December 2010 and January 2011, Relator had a few conversations with Mr. James confirming that physicians billing for patients she saw was an unlawful billing practice.  Dr. Lazarev told Relator that she was going to be fired.

- **January 2011**:  During a meeting in the Human Resources office with Dr. Kalloo and Judith Kimball, the manager of HR, Dr. Kalloo admits that when Relator sees his

patients either because he is not at the clinic or too busy on the phone, he still bills as
if he had seen the patients. Relator was dismissed from the DNP program.

120.    On December 28, 2010, on behalf of Dr. Joseph Herman, Mary Griffith, an RN
from interventional radiology, referred a patient, LN, to Relator for the removal of a
cholecystomy tube placed under CVDL by Dr. Joseph Herman. Relator advised Ms. Griffith that
Relator would NOT be removing the tube and notified Ms. Griffith that Relator would contact
Dr. Okolo who had previously performed a procedure. Dr. Okolo declined to see the patient and
Relator evaluated Ms. LN on or about January 20, 2011. Patient Ms. LN, expressed much
dissatisfaction with Dr. Herman since he had not returned any of Patient Ms. LN's calls. Relator
wanted to admit the patient, Ms. LN, to JHH, and Ms. LN refused to get admitted to the JHH
because, per Patient Ms. LN, people at JHH were irresponsible. Relator instructed Patient Ms.
LN to go the nearest ER should her symptoms worsen. Relator determined that Ms. LN required
an imaging study to assess the patency of the cholecystomy tube. Relator explained to Patient
Ms. LN the need for the study and wrote the orders for the imaging study, marked ASAP and
advised patient to present the orders to the clerks to immediately schedule the study.  Relator
found the orders she wrote and marked ASAP, given to Ms. LN to present to the clerks for
immediate scheduling within the next couple of hours, were thrown into the dust bin. Relator
asked the clerks in the clinic why the orders were in the dust bin, and the clerks informed Relator
that the division management had instructed the clerks not to carry out any orders from Relator
for patients Relator evaluated. Furthermore, the clerks informed Relator that the study required
prior authorization, a task typically carried out by clerks. Relator promptly contacted the division
assistant administrative manager for assistance to obtain prior authorization. The administrative
manager, Ms. Boldin, via email, notified Relator that she would have to do this task by herself in
addition to all her clinical duties. Ms. Boldin later offered to send Relator to training to learn

how to obtain prior authorization. Relator communicated to Patient Ms. LN that Relator was trying to obtain prior authorization to schedule the study. Relator obtained the training and when Relator contacted the insurance company, Relator found out that Patient Ms. LN did not require prior authorization. Relator subsequently contacted the radiology department and scheduled the patient for the study. Relator contacted the patient, Ms. LN, to notify her of the study date and Ms. LN's partner informed Relator that he took patient to the local ER. Relator notified the team of Patient Ms. LN's status and informed the team that Relator would be making arrangements to transfer the patient to JHH. Dr. Joseph Herman, who referred the patient to Relator, was copied on the emails pertaining to Patient LN's status, but remained as a bystander and did not provide any assistance to Relator to schedule the study in his radiology department. On February 2, 2011, Dr. Herman had the gall to send an email to Relator informing Relator that he did not wish to be copied on all the emails. In essence, he did not want to be bothered at all about the patient. He failed in his duty to the patient, to the institution, and did not see that it was his duty to follow up with the patient and provide appropriate care. On February 2, 2011, Ms. Boldin escorted Relator to a meeting with Dr. Kalloo. In this meeting, Dr. Kalloo, in the presence of Ms. Judith Kimball (Compliance Specialist and HR manager) and Ms. Lisa Bach (Clerical Supervisor), informed Relator that Relator would be assigned clerical duties in light of Dr. Herman's email.

121.    Then, from approximately February 2, 2011, until May 5, 2011, Relator was not allowed to see patients and perform clinical duties. Instead, she was assigned basic clerical tasks and denied computer and telephone access. Relator was exiled to a room and instructed not to speak to anyone. GI management (Dr. Kalloo, Ms. Boldin and Ms. Bach) also told the GI faculty and staff that they would be subject to disciplinary action if they communicated with Relator.

43

122.    On May 6, 2011, Relator gave notice of her constructive termination of employment.

123.    Since that time, Relator has been unable to find another job in the Baltimore area as a nurse practitioner despite her best efforts and she has suffered considerably as a result. Two job offers from hospitals (Greater Baltimore Medical Center and Franklin Square Hospital) have been rescinded as a result of Defendants providing false and inaccurate information about Relator to the hospital's credentialing committees.   Relator applied to the UPENN acute care post-master's certificate program. Relator was interviewed and informed that she would be accepted. However, in a face-to-face meeting with Relator, Dr. McCauley, Associate Dean for Academic Affairs, informed Relator that an official from the Johns Hopkins Medicine contacted UPENN and made egregious remarks and advised UPENN authorities to not accept Relator to the program. UPENN then officially rescinded the admission.   Relator accepted a locum tenens position at Frederick Memorial Hospital, pending hospital privileges. Authorities at Frederick Memorial Hospital informed Relator that they received a negative reference from Johns Hopkins Medicine and JHH, and therefore they could not grant Relator privileges to work as an NP.    She has been unable to find a temporary position, as the temp agency recruiter told her that without obtaining hospital credentialing, it would be next to impossible to find a position for her.

H.    <u>False Claims</u>

1.    <u>Billing Medicare and Other Federal Health Care Programs for Physician Services</u>

124.    Providers submit claims to Medicare and other federal health care programs for reimbursement for physician services by using CMS Form 1500.   Most all claims are filed electronically.   The claim form has different numbered fields that the provider must fill in such as the patient's name, address, insured's I.D. number, referring physician's name and patient's

diagnosis.

125.    The form also requires the provider to list all Current Procedural Technology ("CPT") codes for the medical services provided (field number 24D on the claim form) and the "Rendering Provider" NPI number for each CPT code (field number 24J).   CPT codes are published annually by the American Medical Association (AMA) in a CPT Manual and are composed of a five digit numeric codes (which sometimes include a numeric modifier) used to describe procedures, services and supplies.

126.    The AMA's CPT Manual defines new and established patients as follows:

> Solely for the purposes of distinguishing between new and established patients, professional services are those face-to-face services rendered by a physician and reported by a CPT code(s). A new patient is one who has not received any professional services from the physician or another physician of the exact same specialty and subspecialty who belongs to the same group practice, within the past three years.

> An established patient is one who has received professional services from the physician or another physician of the exact same specialty and subspecialty who belongs to the group practice, within the past three years

127.    The range of CPT codes for a new patient office visit is 99201– 99205 and for an established patient office visit is 99211-99215.   The CPT code selected for an office visit depends on how much patient history, exam and medical decision-making is involved in the patient's visit.   If higher level complexities are involved, the visit should be billed at the higher CPT codes (e.g., 99204, 99205 for new patients or 99214, 99215 for established patients).

128.    Medicare instructs physicians and coding staff to list the name (claim field location 31) and NPI number of the physician (claim field location 24J) who actually rendered the services to the patient on the CMS Form 1500.  The physician name and NPI number listed on the CMS Form 1500 must be the name and identification number of the provider who actually

rendered the services to the patient, unless furnished incident-to the physician's services and all the requirements thereto are met.

129.   In addition, the physician must sign the form (field number 31) and attest to the certifications found on the reverse side of CMS Form 1500.   These certifications include the following relevant statements:

> **SIGNATURE OF PHYSICIAN OR SUPPLIER**
> **(MEDICARE, CHAMPUS, FECA AND BLACK LUNG)**
>
> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and *were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision . . .*
>
> *For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's office, and 4) the services of nonphysicians must be included on the physician's bill.*
>
> \*\*\*\*\*
>
> NOTICE:  This is to certify that the foregoing information is true, accurate and complete.

CMS Form 1500 (italics added).

130.   If billing under the physician's NPI for incident-to services (which meet all the requirements), the NPP is invisible on the claim form.  There is no code for "incident-to" or indication that the services were performed by a NPP incident-to the services of the physician. However, as stated above, the form does specifically contain the physician's "personal performance" certification stating that the services were performed personally by the physician or incident-to and details the requirements for incident-to billing.  Also, the physician must

certify that all the information on the form is true, accurate and complete.

131.    The Office of Inspector General (OIG) has specifically identified the misuse of NPI numbers as a potential area for fraud in coding and billing government health care programs. Specifically, in the OIG's Compliance Program for Individual and Small Group Physician Practices, 65 Fed. Reg. 59434 (Oct. 2000), states "The following risk areas associated with billing have been among the most frequent subjects of investigations and audits by OIG: . . . *Knowing misuse of provider identification numbers*, which results in improper billing...."  65 Fed. Reg. at 59439.

## 2. **Johns Hopkins Medicine Knowingly Caused The Submission Of False Claims and Patient Safety Violations**

132.    Johns Hopkins Medicine knowingly caused the submission of false claims to the government by billing for services rendered to new patients/new problems by NPPs as if those services were rendered by a physician.

133.    Typically, after a patient office visit, Relator (or another NPP who saw the patient) would dictate the Clinic Note, a part of the patient's Medical Record, to document the patient visit.  The physician would review the Clinic Note, sometimes revise it and add an addendum, and then sign off on it.

134.    After the physician signed the Clinic Note, the physician would log onto Johns Hopkins Medicine's billing system, called TAP.  The physician's NPI number was already in TAP.  While in the billing system, the physician would select the appropriate diagnosis and CPT billing codes for the patient's visit, knowing that Johns Hopkins Medicine's Billing Department would use this information to generate false claims, including claims to the government for reimbursement.

135.    There was not a particular CPT code for physician's services; billing was based

47

on the Clinic Note including the provider who signed the Clinic Note, and the CPT codes selected in the TAP billing system.

136.    The below chart lists the relevant CPT codes used to bill for a new patient office visit as well as the Medicare Physician Fee Schedule reimbursement for 2011:

| CPT CODE | MEDICARE REIMBURSEMENT Locality 1230201 Baltimore/Surr. Cntys, MD |
|----------|------------------------------------------------------------------|
| 99201 | $43.59 |
| 99202 | $75.07 |
| 99203 | $108.76 |
| 99204 | $166.76 |
| 99205 | $207.19 |

137.    And, for an established patient office visit the relevant CPT codes and Medicare Physician Fee Schedule reimbursement for 2011 are as follows:

| CPT CODE | MEDICARE REIMBURSEMENT Locality 1230201 Baltimore/Surr. Cntys, MD |
|----------|------------------------------------------------------------------|
| 99211 | $20.99 |
| 99212 | $43.96 |
| 99213 | $72.77 |
| 99214 | $107.76 |
| 99215 | $144.80 |

138.    Johns Hopkins Medicine's billing department would then generate the CMS form 1500 based on the information submitted from the physician.  Specifically, it is Relator's belief

48

that physician fees were billed by the Johns Hopkins University Clinical Practice Association (referred to herein as the "group practice").

139.    Billing the government for new patient/new problem office visits as if the physician saw the patient when the NPP actually rendered the services to the new patient was false and fraudulent and caused the government to overpay.  Upon information and belief, the claims submitted to the government were false and fraudulent for at least three reasons: for the following reasons:

> (1)    **Misidentification of the rendering provider's name and NPI number**: rather than the physician's or group practice's name and NPI number, the NPP's name and NPI number should have been listed on the claim as the rendering provider because the NPP handled the new patient/new problem office visit and the incident-to rules for physician billing do not apply to new patient/new problem office visits.

> (2)    **Provider's "personal performance" certification**: the certification on the reverse side of the form which states that the services performed were personally performed by the provider or furnished incident-to the physician's services was false and fraudulent.  The NPP, not the physician, personally performed the services and the NPP's services do not qualify as incident-to the services of the physician.

> (3)    **Provider's responsibility for true, accurate and complete claims:**  the certification on the reverse side of the claim form applies to all of the information on the claim form and was false and fraudulent in that the physician or group practice should not be billing under their NPI number when in fact the services were performed by the NPP and the incident-to billing rules were not met.

140.    Upon information and belief, Johns Hopkins' billing department submitted false and fraudulent claims during the relevant time period to Medicare and other federal health care programs.   The claims to Medicare would have been submitted through the Medicare Administrative Contractor during the relevant time period, Highmark (now, Novitas).

141.    Incorrect incident-to billing is material to the government -- Medicare's *Incident to Service Guidelines* emphasize that incorrect incident-to billing would be material to

Medicare's decision to pay in that Medicare will deny claims for payment if providers billed NPP performing the initial patient visit as incident-to services.

142.    Upon information and belief, Medicare reimbursed these false and fraudulent claims at 100% of the Physician Fee Schedule amount (compared to 85% reimbursement if billed correctly under the NPP's number).  The approximate Medicare reimbursement for an office visit at 100% of the Physician Fee Schedule ranges from $43-$207 for a new patient visit and $20-$144 for an established patient with a new problem.  By fraudulently billing, Johns Hopkins Medicine caused Medicare to overpay from approximately $6-$31 for each new patient visit and from $3-$21 for each established patient visit.  Considering Johns Hopkins Medicine physicians at the Clinics typically scheduled about sixteen patients a day, many of whom were new patients/new problems, with the NPP seeing about half of those patients, and sometimes more, the amount overbilled to Medicare is significant.

## VIII.   PATIENT SAFETY VIOLATIONS AND IMPROPER BILLING FOR DIAGNOSTIC TESTS AND PROCEDURES

143.    As detailed more fully in the subsections below, Johns Hopkins Medicine knowingly and improperly billed Medicare, Medicaid and other federal health care programs for GI diagnostic tests (such as, esophageal manometry, anorectal manometry) and for certain GI procedures (such as, colonoscopies and upper endoscopies) as if the physician had performed these tests/procedures when in fact other providers had actually done the work and were not qualified or were not properly supervised by a physician while doing it.

144.    Johns Hopkins Medicine motivated its physicians through bonuses to fraudulently bill for tests and procedures.  As discussed above, at Johns Hopkins Medicine, physicians are paid a salary plus a quarterly bonus based on relative value units (RVUs) which are a way to calculate compensation by using a set formula tied to various physician services.  Different

office visits and procedures are assigned different Work RVU values, such as a screening colonoscopy (Work RVU of 3.56), a new office visit level 5 (Work RVU of 3.17).  Bonuses were calculated based on Work RVU's.  Thus, Johns Hopkins Medicine physicians were incentivized to improperly cause Johns Hopkins Medicine to bill for these diagnostic tests and procedures in order to make more money.

### A.     Johns Hopkins Medicine Improperly Billed for Esophageal Manometry, Anorectal Manometry and pH Impedance Testing Which Were Done By Unauthorized and Unqualified Personnel Constituting Patient Safety Violations

145.   Upon information and belief, throughout the relevant time period, Johns Hopkins improperly billed the government as if physicians had performed certain diagnostic tests at the Johns Hopkins Medicine Clinics (Green Spring and JHOC) when in fact the tests were performed by unqualified nurses, nursing assistants or nursing technicians.

146.   These are complicated tests being performed by unsupervised and unqualified nursing personnel and then being billed by physicians:

• **Esophageal manometry** is used to measure pressure within the esophagus to assist in the diagnosis of esophageal pathology.  The test takes approximately 60 minutes and involves the provider applying an anesthetic gel to the nasal passage and then passing a catheter through until test completion.

• **Anorectal manometry** is performed to evaluate patients with constipation or fecal incontinence.  The test takes approximately 60 minutes and involves inserting a small, flexible tube with a balloon at the end into the rectum.  The tube is connected to a machine which measures the pressure.

• **pH Impedance** is a test used to measures the amount of acid and non-acid gastroesophageal reflux.  Gastroesophageal reflux is the backward flow of food and acid from the stomach into the esophagus.  The test is performed by placing a probe through the patient's nose into their esophagus.  The probe is connected to a box which records the amount of acid and is kept in place for 24 hours.

147.   Medicare does not reimburse for nurses, nursing assistants, or technicians performing these complicated diagnostic tests.  A nursing assistant or nursing technician, for

example, usually only holds a high school diploma and has received a certification to work as a nursing assistant/technician from a training program.

148.    Medicare only reimburses for NPPs performing these diagnostic tests if done under the direct supervision of a physician.  Medicare Reference Manual, Chapter 28 – Physician Supervision of Diagnostic Tests, § 28.1; 42 C.F.R. § 410.32(b).  Under Medicare, nurses, nursing assistants or technicians are not considered NPPs and cannot perform these tests even with a physician supervising.   Rather, physician assistants, nurse practitioners and clinical nurse specialists are considered NPPs who practice in collaboration with or under the supervision of a physician.[11]  Medicare does not reimburse for nurses, nursing assistants/technicians performing these diagnostic tests because they do not – by any stretch – meet the definition of NPPs.

149.    In contrast, to a nursing assistant/technician, a nurse practitioner, for example, is required to have a college degree in nursing as well as a master's Degree or to have completed a Post-Master's certificate as a nurse practitioner to practice in the State of Maryland.

150.    Further, Medicare only covers services that are considered medically necessary in that they are "reasonable and necessary for the diagnosis or treatment of illness or injury."  42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1).  Likewise, Medicaid only covers medically

---

[11] Medicare defines NPP to include the following:
   • Physician assistant;
   • Nurse practitioner;
   • Clinical nurse specialist;
   • Certified registered nurse anesthetist;
   • Certified nurse midwife;
   • Clinical psychologist;
   • Clinical social worker;
   • Registered dietitian; or
   • Nutrition Professional
Medicare Benefit Policy Manual, Chapter 15 – Covered Medical and Other Health Services, § 40.4.

necessary services rendered by a physician or a small number of health care providers.  Code of Md. Reg. § 10.09.02.04.  These tests performed by unqualified nurses, nursing assistants and techs were not medically necessary and were not reimbursable.

151.    In addition, these tests could be considered "worthless services" in that Medicare believed it was paying for a service with medical value (a diagnostic test performed by a qualified physician) when in fact it was paying for services so deficient as to be worthless. Claims for "worthless" medical care are false claims in violation of the False Claims Act.  *See Mikes v. Straus*, 274 F.3d 687, 702-704 (2d Cir. 2001); *United States v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001).

152.    Upon information and belief, Johns Hopkins improperly billed Medicare, Medicaid and other federal health care programs as if physicians had performed these diagnostic tests at two of the Johns Hopkins Medicine Clinics (Green Spring and Johns Hopkins Medicine OC) throughout the relevant time period.  Some of the nursing staff who actually performed these tests included: Joycella Gillyard, a nursing assistant/technician named Karen and a nurse named Mary Jo.  Upon information and belief, the physicians who falsely claimed to have performed these tests included:  Drs. John Clarke and Ellen Stein.

153.    The following chart lists the most commonly used CPT codes for these tests as well as the 2011 Medicare reimbursement amounts for physician services and the global fee:

| Diagnostic Test | CPT Code | Medicare Reimbursement For Physician Services | Medicare Reimbursement Global Fee |
|---|---|---|---|
| Esophageal Manometry Testing | 91010 | $72.09 | $200.65 |
| Anorectal Manometry Testing | 91122 | $93.54 | $244.20 |

| pH Impedance Testing | 91034 | $53.93 | $212.32 |
|---|---|---|---|

154.    In sum, Johns Hopkins Medicine knowingly caused false claims to be submitted to Medicare, Medicaid and other federal health care programs for reimbursement for certain diagnostic tests as if physicians had performed these tests when in fact they were performed by unqualified nurses, nursing assistants and nursing technicians and were not medically necessary and essentially worthless.

**B.      Johns Hopkins Medicine Improperly Billed for Breath Analysis Tests**

155.    Upon information and belief, throughout the relevant time period, Johns Hopkins improperly billed Medicare, Medicaid and other federal health care programs for physician services for certain breath analysis tests at the GI Lab at the Green Spring Clinic when in fact the physician services were performed by a nurse.

156.    Breath analysis tests can be used to diagnose a number of different GI conditions such as small intestinal bacterial overgrowth, lactose or fructose intolerance or H. pylori bacteria which indicates peptic ulcer disease.  The breath analysis tests take approximately three hours and involve the patient ingesting a liquid and then exhaling breath which is then analyzed.

157.    Under the Medicare Clinical Lab Fee Schedule, a nurse may perform the breath analysis tests and may then provide the testing results to the physician/NPP.  In order for the physician/NPP to bill Medicare, the physician/NPP must interpret the test results and formulate the decision-making and plan of care, based on the test data.

158.    Instead, at the Johns Hopkins Medicine Clinic, Nurse Eric Tomakin routinely performed as well as interpreted the breath analysis tests for patients and would call the Green Spring Clinic and tell them which drug or drugs to prescribe for the patient.  Upon information and belief, Dr. Mullin would then sign off on these tests, falsely claiming to have interpreted the

test results and formulated a plan of care.[12]

159.    The following is the relevant CPT code for the breath analysis test as well as the

2011 Medicare reimbursement amounts for physician services and the global fee:

| Diagnostic Test | CPT Code | Medicare Reimbursement For Physician Services | Medicare Reimbursement Global Fee |
|---|---|---|---|
| Breath Test | 91065 | $11.00 | $85.78 |

160.    In sum, Johns Hopkins Medicine knowingly caused false claims to be submitted

to Medicare, Medicaid and other federal health care programs for reimbursement for these breath

tests as if the physician had interpreted the test results and formulated a plan of care when in fact

a nurse had done this work.

**C.    Johns Hopkins Medicine Improperly Billed for Colonoscopies, Polypectomies, Sigmoidoscopies, and Upper Endoscopies Performed by NPPs In Direct Violation of Patient Safety.**

161.    Johns Hopkins improperly billed Medicare, Medicaid, other federal health care

programs in addition to a federal grant program for colonoscopies, sigmoidoscopies, and upper

endoscopies as if performed by a physician when in fact they were performed by a nurse

practitioner.  This caused the government to reimburse more for these procedures than if Johns

Hopkins Medicine had properly billed as having been performed by the NP.

162.    There are three Johns Hopkins Medicine nurse practitioners who performed or are

still performing colonoscopies on patients while physicians are improperly billing:   Monica

---

[12] Under Medicaid, medically unnecessary services are not covered and reimbursed.  Code of Md. Reg. § 10.09.02.04.  Breath analysis tests interpreted by a nurse are medically unnecessary for the diagnosis and treatment of the patient and should not have been reimbursed.

VanDongen, Monica Nandwani, who was at least on a student visa, and Sharon Dudley Brown.

163.    Under Medicare, nurse practitioners are in fact not authorized to perform screening colonoscopies, diagnostic colonoscopies, diagnostic sigmoidoscopies, and upper endoscopies on Medicare patients and bill for reimbursement under the NP's name and NPI number.[13]   Here, however, physicians were billing for colonoscopies with polypectomy diagnostic sigmoidoscopies, and upper endoscopies performed by an NP.   Contrary to Medicare rules, the NPs did not bill for these colonoscopy procedures, but rather, physicians billed for these procedures as if they had conducted or supervised these procedures when in fact they had not.

164.    Medicare reimbursement rules depend on the location of the colonoscopy procedures.   Here, all three nurse practitioners performed colonoscopies at two locations: 1) Blalock, which is an inpatient building that is part of Johns Hopkins Hospital; and 2) Johns Hopkins Medicine OC, a Johns Hopkins Medicine Clinic.

165.    At Blalock, which is considered a hospital setting, Medicare does not allow NP services to be billed "incident-to" a physician's services in the hospital, so NP's services should be billed using the NP's name and NPI, which they were not.   Furthermore, Blalock endoscopy suite is meant for high-risk patients who do not meet the ASA (American Anesthesiology Association) criteria to undergo procedures at JHOC. NPs are not even allowed to perform sigmoidoscopy at Blalock.

---

[13] According to Novitas, nurse practitioners are not authorized to perform colonoscopies on high risk patients (e.g., patients with co-morbid illness, polyp removed, or previous cancer).  To the extent these JOHNS HOPKINS MEDICINE nurse practitioners were performing colonoscopies on high risk patients, any subsequent claims to Medicare, Medicaid or other federal health care programs were false because these procedures were not medically necessary and were not reimbursable.

166.    In October 2010, Dr. Kalloo announced in a meeting that he was reducing the spaces available to GI fellows in colonoscopy and endoscopy training because it was not profitable to train physicians in these procedures.  Instead, NPPs were scheduled to attend the colonoscopy and endoscopy training.

167.    During approximately 2009-2010, Ms. VanDongen performed screening and diagnostic colonoscopies with polypectomy, diagnostic sigmoidoscopies, and upper endoscopies at Blalock (as well as at the Johns Hopkins Medicine Clinic, discussed below), even though she was not authorized to perform these procedures.  Upon information and belief, Drs. Mullin and Kalloo improperly billed during this time frame for colonoscopies including those with polypectomy, diagnostic sigmoidoscopies, and upper endoscopies performed by Ms. VanDongen.

168.    From approximately 2010-2011, Ms. Nandwani, while on a student visa, performed screening and diagnostic colonoscopies with polypectomy, diagnostic sigmoidoscopies, and upper endoscopies at Blalock (as well as at the Johns Hopkins Medicine Clinic, discussed below), even though she was not authorized to perform these procedures. Upon information and belief, Drs. Mullin and Kalloo improperly billed during this time frame for colonoscopies including polypectomy, diagnostic sigmoidoscopies, and upper endoscopies performed by Ms. Nandwani.

169.    From approximately 2010 to the present, Ms. Dudley Brown has been performing screening and diagnostic colonoscopies and polypectomy, diagnostic sigmoidoscopies, and upper endoscopies at Blalock (as well as at the Johns Hopkins Medicine Clinic, discussed below), even though she was not authorized to perform these procedures.  Upon information and belief, Dr. Mullin is improperly billing for these procedures performed by Ms. Dudley Brown.

170.    For colonoscopies, polypectomy, diagnostic sigmoidoscopies, and upper endoscopies performed at the other location, JHOC, a Johns Hopkins Clinic, Medicare's "incident-to" billing rules applied.  Thus, in order for the physician to bill, the services must have been provided incident-to the services of a physician in that the NP must have performed the colonoscopies, diagnostic sigmoidoscopies, and upper endoscopies under the physician's direct supervision (the physician must be present in the office suite).

171.    During approximately 2009-2011, Ms. VanDongen performed screening and diagnostic colonoscopies with polypectomy, diagnostic sigmoidoscopies, and upper endoscopies at Johns Hopkins Medicine OC while upon information and belief, Drs. Mullin and Kalloo improperly billed for procedures performed when they were not providing direct supervision and Ms. VanDongen was not authorized to perform these procedures.

172.    From approximately 2010-2011, Ms. Nandwani while on a student visa, performed screening and diagnostic colonoscopies with polypectomy at JHOC and upon information and belief, Drs. Mullin and Kalloo improperly billed for procedures performed when they were not providing direct supervision and Ms. Nandwani was not authorized to perform these procedures.

173.    From approximately 2010 to the present, Ms. Dudley Brown has been performing screening and diagnostic colonoscopies, diagnostic sigmoidoscopies, and upper endoscopies at JHOC and upon information and belief, Dr. Mullin improperly billed for procedures performed when they were not providing direct supervision and Ms. Dudley Brown was not authorized to perform these procedures.

174.    For colonoscopies, the appropriate CPT billing codes (HCPCS G-codes), descriptions and reimbursement for physician services at Blalock and at the Johns Hopkins

Medicine Clinic are presented on the following chart:

| HCPCS Screening Code | Description | Medicare Reimbursement - Physician Services at Blalock | Medicare Reimbursement - Physician Services Johns Hopkins Medicine Clinic |
|---|---|---|---|
| G0105 | Colorectal cancer screening: Colonoscopy on individual at high risk | $232.51 | $422.19 |
| G0121 | Colorectal cancer screening: Colonoscopy on individual not high risk | $232.51 | $422.19 |

175.   Johns Hopkins Medicine knowingly caused false claims to be submitted to Medicare, Medicaid[14] and other federal health care programs for reimbursement for colonoscopies, diagnostic sigmoidoscopies, and upper endoscopies as if performed by a physician when in fact they were performed by unauthorized nurse practitioners without the proper physician supervision.

176.   In addition to defrauding Medicare and other federal health care programs, upon information and belief, Johns Hopkins Medicine caused false claims to be paid by a grant from the Centers for Disease Control (CDC).   The CDC grant program, titled "Baltimore City Colorectal Cancer Screening Demonstration Program," is geared toward providing free colorectal cancer screening to indigent Baltimore City residents and Johns Hopkins was chosen as one of the grant recipients.

177.   As a result, from approximately 2009 to February 2011, Johns Hopkins Medicine nurse practitioner Monica VanDongen performed screening and diagnostic colonoscopies on

---

[14] Medicaid only covers medically necessary services and procedures, Code of Md. Reg. § 10.09.02.04.  Colonoscopies performed by NP's without the proper physician supervision are not medically necessary.

indigent patients paid for by the CDC grant. During a part of that time (from approximately 2009-2010), she performed these procedures while pursuing a non-accredited NP fellowship. She performed approximately 200 colonoscopies a year on indigent patients. Patients were *not* told that an NP, not a physician, would be performing their colonoscopy.

178.    On around June 30, 2010, VanDongen's credentialing at Johns Hopkins Medicine expired, however, she continued to perform colonoscopies on unknowing patients. Dr. Mullin raised the issue with the head of the credentialing committee stating that VanDongen is putting "patients in harm's way." Dr. Mullin urged Dr. Petty to "fight this gross injustice and irresponsible attempt to credential her" and said "it puts patients in harm's way."

179.    On August 10, 2010, Dr. Mullin raised his concern of Monica VanDongen's endoscopy credentials with Dr. Brent Petty, stating, "I take it that the NP's endoscopy credentials have passed and once again…. I guess crime pays at Hopkins. I utter to think about what will happen to those patients who are placed at risk."

180.    Since Johns Hopkins Hospital approved NP Monica VanDongen's credentialing and extended unprecedented full hospital privileges to perform endoscopic procedures, she continues to perform screening and diagnostic colonoscopies with polypectomy and upper endoscopy including administering BOTOX injection at Johns Hopkins Medicine.

D.    **Johns Hopkins Medicine Improperly Billed for the Unsupervised Procedures Performed by Fellows Which Was Also a Violation of Patient Safety.**

181.    During the relevant time period, there were over twenty GI fellows at Johns Hopkins Hospital[15], which is considered a teaching hospital. Medicare has very specific rules

---

[15] Some of the fellows included the following:
Dr. Vinay Chndrashekar
Dr. Olivia Pickett Blakely
Dr. Vivian Asamoah

regarding teaching physicians billing for services performed by fellows.  Essentially, in order to bill Medicare for the services of a fellow such as for a) interpreting a diagnostic test (see subsection 1. Below), the teaching physician must also personally interpret the test by reviewing the images; or b) performing a complex procedure (see subsection 2. Below), the teaching physician must be physically present during all key portions of the procedure.  As alleged below, at certain times teaching physicians did not meet these Medicare billing requirements, yet still improperly caused Johns Hopkins Medicine to bill Medicare as if they did.[16]

1.    **Johns Hopkins Medicine Improperly Billed for Capsule Endoscopies and Was in Violation of Patient Safety**

182.    Throughout the relevant time period, Johns Hopkins Medicine improperly billed for capsule endoscopy tests interpreted by fellows (physicians in training) and nurse practitioners as if they were interpreted by a physician, Dr. Mullin. Nurse practitioners are not permitted to read capsule endoscopy.

183.    A capsule endoscopy is "a minimally invasive technology offered by the Johns

---

Dr. Jennifer Cohen Price
Dr. Stuart Amateau
Dr. Rukshana Cader
Dr. Lea Ann Chen
Dr. Sameer Dhalla
Dr. James Hamilton
Dr. Brian Kim
Dr. April Tignor
Dr. Moen Khashab
Dr. Kenolisa Onwueme
Dr. Eun Ji Shin
Dr. Kerry Dunbar
Dr. Ann Marie O'Brien Lennon
[16] In 2003, Johns Hopkins University settled similar claims with the government involving improper Medicare billings for the services of teaching physicians when in fact the services were actually delivered by an intern or resident of the teaching hospital.  JOHNS HOPKINS MEDICINE is clearly very much aware of the billing rules, considering it settled this case in 2003, alleging very similar conduct as pled in this complaint.

Hopkins Division of Gastroenterology and Hepatology to diagnose digestive disorders, such as Crohn's disease, celiac disease, ulcerative colitis, and tumors."[17]   The patient is outfitted with a data recorder and then swallows a video capsule which is about the size of a large vitamin pill. After the patient swallows the capsule, it takes thousands of images of the patient's digestive tract and transmits those images to the data recorder.  After eight hours, Johns Hopkins Medicine collects the video images from the patient's data recorder.

184.    There were more than approximately 100 capsule endoscopies performed on inpatients at Johns Hopkins Hospital as well as outpatients at the Johns Hopkins Medicine Clinics (Green Spring and Cedar Lane) each year.

185.    Medicare has specific rules governing fellows, residents and interns interpreting diagnostic tests:

> **Interpretation of Diagnostic Radiology and Other Diagnostic Tests**
>
> Medicare pays for the interpretation of diagnostic radiology and other diagnostic tests if the interpretation is performed by or reviewed with a teaching physician.  *If the teaching physician's signature is the only signature on the interpretation, Medicare assumes that he/she is indicating that he/she personally performed the interpretation.*   If a resident prepares and signs the interpretation, the teaching physician must indicate that he/she has personally reviewed the image and the resident's interpretation and either agrees with it or edits the findings.  Medicare does not pay for an interpretation if the teaching physician only countersigns the resident's interpretation.

Medicare Claims Processing Manual, Chapter 12 – Surgical Procedures § 100.1.2.6 (emphasis added).

---

[17]                                                                                       http://www.hopkins-gi.org/CMS/CMS_Page.aspx?CurrentUDV=31&CMS_Page_ID=E94E7861-C931-4D5E-9CB8-90F8BFB3579E.

186.     At Johns Hopkins Medicine, the fellows interpreted the thousands of images from

the capsule endoscopy procedure and would identify any abnormalities.  In many instances, the

teaching physician, Dr. Mullin signed off on the fellow's interpretation without reviewing it with

the fellow or looking at the images.  In other instances, Dr. Mullin listened to the fellow's

presentation of the interpretation, did not look at the images, and then signed off on the

document.  In both situations, Dr. Mullin failed to follow the rather clear Medicare billing rules.

In direct violation of those rules, he billed the government as if he had done the test

interpretation.  In addition, between 2009 and 2010 NPs were assigned to interpret capsule

endoscopy images and identify any abnormalities, even though NPs are not authorized to read

capsule endoscopy images.

187.     For capsule endoscopies, the appropriate Medicare billing codes, descriptions and

reimbursement for 2011 for Maryland for physician services at the Clinic, the global fee and

physician services in the hospital are presented on the following chart:

| HCPCS Code | Description | Medicare Reimbursement- Physician Services Johns Hopkins Medicine Clinic | Medicare Reimbursement – Global Fee, Johns Hopkins Medicine Clinic | Medicare Reimbursement - Physician Services, Hospital |
|---|---|---|---|---|
| 91110 | GI tract capsule endoscopy | $205.92 | $989.69 | $224.97 |
| 91111 | Esophageal capsule endoscopy | $56.81 | $796.38 | $56.81 |

188.     In sum, Dr. Mullin improperly billed as if he had interpreted the results of the

capsule endoscopy tests when in fact the interpretations were done by fellows.  As a result, Johns

Hopkins Medicine knowingly caused false claims to be submitted to Medicare, Medicaid[18] and other federal health care programs for reimbursement for capsule endoscopies.

### 2. Johns Hopkins Medicine Improperly Billed for Inpatient ERCP Tests, EGDs, Colonoscopies, Polypectomies and Endoscopic Ultrasounds.

189.    Throughout the relevant time period and continuing until the present, Johns Hopkins Medicine has been improperly billing Medicare, Medicaid and other federal health care programs for certain procedures as if performed by physicians when in fact they were performed by GI fellows at Johns Hopkins Hospital while the physicians were not even at the hospital.

190.    Specifically, the GI fellows performed ERCP tests, EGDs, colonoscopies and endoscopic ultrasounds in the hospital.  In order for physicians to bill for the fellows performing these endoscopic procedures, the physician must be present during the entire procedure.  Instead, physicians billed for fellows performing procedures under two possibly fraudulent scenarios:

> • while the physician was not at the hospital, but the physician was billing for them; or

> • while an unlicensed physician was supervising in person (physician did not have MD medical license); and a different physician (not present) was billing for them.

191.    Under the pretext of a Nurse Practitioner GI fellowship program for NPs that was not accredited by any accrediting body, such as the Accreditation Council for Graduate Medical Education (ACGME), the American Nursing Credentialing Center (ANCC) or the American Association of Nurse Practitioners (AANP), NPs who were on student visas were allowed to perform colonoscopy with polypectomy and upper endoscopy and to read capsule endoscopy while physicians billed for these procedures. Monica Nandwani, a student visa holder, was one

---

[18] Medicaid only covers medically necessary hospital services and physician services and procedures.  Code of Md. Reg. §§ 10.09.02.04, 10.09.06.04.  A capsule endoscopy test interpreted by a fellow and not a physician is medically unnecessary for the diagnosis or treatment of the patient.

of the NPs who was allowed to engage in this unlawful conduct during the academic year of 2010-2011. Furthermore, ASGE (American Society of Gastrointestinal Endoscopy) does not support or endorse NPPs performing the aforementioned invasive procedures.

192.    The following are descriptions of the relevant procedures being performed by the fellows and nurse practitioners but billed by the physicians:

- **ERCP** (endoscopic retrograde cholangiopancreatography) is a procedure used to diagnose diseases of the gallbladder, biliary system, pancreas, and liver.  Prior to the procedure, the patient is sedated.  After sedation, a flexible, lighted endoscope is inserted through the mouth and down the throat and past the stomach in order to examine for any abnormalities the tubes that drain the liver, gallbladder and pancreas.  A common complication of this procedure is post-ERCP pancreatitis.

- **Upper Endoscopy or esophagogastroduodenoscopy** (EGD) is a test to examine the lining of the esophagus, stomach, and first part of the small intestine. It is done with a small camera (flexible endoscope) that is inserted down the throat.  It is performed for a number of reasons including if the patient is complaining of heartburn, pain in the upper abdomen, unexplained weight loss or vomiting and swallowing difficulty.

- **Colonoscopy** is a test which uses a flexible tube called a colonoscope to examine the inner lining of a patient's large intestine for ulcers, polyps, tumors or bleeding.  A video camera is attached to the colonoscope for the physician to take pictures or video.  Prior to the procedure, the patient is sedated.

- **Endoscopic ultrasound (EUS)** is a procedure used for a number of different reasons including the staging of cancers of the esophagus, stomach, pancreas and rectum and evaluating chronic pancreatitis or pancreatic cysts.  Prior to the procedure, the patient is sedated.   After sedation, the physician inserts a flexible endoscope with a small ultrasound transducer on the tip into the patient's mouth or rectum in order to obtain ultrasound images of the digestive tract and the surrounding tissue and organs.

- **Endoscopic Botulinum Toxin Injection:** Botulinum toxin, one of the most poisonous biological substances known, is a neurotoxin produced by bacterium *Clostridium botulinum*, the same bacteria that causes botulism. The BOTOX 'A' neurotoxin is injected endoscopically into the lower esophageal sphincter to treat Achalasia and Gastroparesis. Achalasia, is a rare, yet serious disease of the muscle of the lower esophageal body and lower esophageal sphincter and Gastroparesis is a disorder that results in delayed emptying of the stomach contents. Using BOTOX for Achalasia and Gastroparesis is considered an off label use of the product and the long term safety and efficacy remain uncertain and the evidence for use in Gastroparesis is not very good. BOTOX comes with a black box warning that states: "DISTANT SPREAD OF TOXIN EFFECT."

193.    As mentioned above, Medicare has specific guidelines for teaching physicians billing for the services of a resident, intern or fellow.[19]  Services performed in teaching settings are paid through the Medicare Physician Fee Schedule if the services are "[f]urnished by a resident [or intern or fellow] where a teaching physician was physically present during the critical or key portions of the service."  § 100.1.  Specifically, the Medicare guidelines require that "[i]n order to bill for surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical and key portions of the procedure and be immediately available to furnish services during the entire procedure."  § 100.2.

194.    Further, the Medicare guidelines contain a specific subsection having to do with billing for endoscopy procedures, such as the procedures at issue here, ERCP, colonoscopy and EUS:

> To bill Medicare for endoscopic procedures . . . the teaching physician must be present during the entire viewing. The entire viewing starts at the time of insertion of the endoscope and ends at the time of removal of the endoscope. Viewing of the entire procedure through a monitor in another room does not meet the teaching physician presence requirement.

Medicare Claims Processing Manual, Chapter 12, § 100.1.2.5.

195.    In addition, Medicaid only covers medically necessary hospital services. Procedures performed by fellows without the supervision of a teaching physician are arguably not medically necessary for the diagnosis or treatment of the patient.  Code of Md. Reg. § 10.09.06.04.

196.    The GI fellows often performed procedures at night and weekends and the

---

[19] The term "resident" is used throughout the Medicare Claims Processing Manual and it is defined to include interns and fellows. § 100 Definitions.

attending physician would not come in to the hospital.  It is Relator's belief that the following physicians were billing for procedures performed by the fellows at night and weekends when the physician was not even at the hospital:  Drs. Canto, Kalloo, Okolo and Mullin.

197.    Further, from July 2008-July 2010, an unlicensed physician from Ireland, Ann Marie O'Brien Lennon, was an "Advanced Therapeutic Fellow" at Johns Hopkins Medicine and given the status of attending physician.   She "supervised" many of the fellows performing procedures, although she did not bill for these procedures.   Another physician billed.   It is Relator's belief that the physicians who billed were most likely Dr. Kalloo or the advanced therapeutic fellowship director, Dr. Canto.   Dr. O'Brien Lennon herself also performed procedures without any physician supervision with another physician billing.  Then, in April of 2010, Johns Hopkins Medicine discovered that O'Brien Lennon had been practicing without a Maryland medical license and she left the hospital.

198.    In an email to Dr. Brent Petty, the Chair of the Credentialing Committee, dated August 16, 2010, Dr. Mullin raised issues with respect to O'Brien Lennon's credentials, including her practicing without a Maryland medical license.

199.    Thus, these procedures which were "supervised" by Dr. O'Brien Lennon but billed by other physicians (most likely Drs. Kalloo or Canto) were also not properly billed because Dr. O'Brien Lennon did not have a Maryland medical license and even if she did, she was still not the physician doing the billing and under the rules, the teaching physician who is present during the procedure bills for the procedure.

200.    Relator has witnessed procedures being performed by fellows without physician supervision.  For example, in or around April 2008, fellow Dr. Dunbar performed an upper endoscopy (EGD) on a patient without the proper supervision from Dr. Canto who billed for the

procedure. This patient had specifically requested Dr. Canto and no other physicians to perform the procedure. When Relator raised this with Dr. Canto, she responded (to paraphrase): "I know she wants me to do it but she will be asleep and Dr. Dunbar needs practice. Patients cannot demand that I do it all the time."

201.    For example, on or around April 2010, Relator witnessed fellow Dr. Rukshana Cader performing an EGD on a patient without proper physician supervision.

202.    Further, Relator has also witnessed the following fellows performing numerous unsupervised procedures on patients: Drs. Singh (when he was a fellow), Eun Ji Shin and Ann Marie O'Brien Lennon.

203.    In terms of improper physician billing by Johns Hopkins Medicine for ERCP tests, EGDs, colonoscopies and endoscopic ultrasounds performed in the hospital, there are numerous relevant CPT codes depending on the base code and any other procedures or techniques performed during the procedure.

204.    In sum, Johns Hopkins Medicine knowingly caused false claims to be submitted to Medicare, Medicaid and other federal health care programs for reimbursement for these inpatient endoscopy procedures as if they were properly supervised by attending physicians when in fact they were performed by fellows at night and on the weekends when the attending physicians were often not in the hospital.

205.    Relator, as a relator, previously caused the claims outlined in this complaint to be brought against Defendants in the U.S. District Court for the District of Maryland on behalf of the United States and the State of Maryland as a part of Civil Action No. 1:12-cv-01953, which action was initiated on June 29, 2012. The State of Maryland declined to intervene and proceed with the action within sixty (60) days of receipt of the complaint and material evidence and

information, pursuant to Md. Code Ann., Health-General § 2-604(a)(3)(ii)(3).  The United States also elected not to intervene in this action on January 13, 2014, and these claims were dismissed from Civil Action No. 1:12-cv-01953 without prejudice on January 30, 2014.  Relator hereby proceeds with this action pursuant to 31 U.S.C. § 3730(c)(3) and Md. Code Ann., Health-General § 2-604(b)(1)(ii).

### IX.   COUNTS

### COUNT I
### Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A)-(B)

206.   Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further allege as follows:

207.   Throughout the relevant time period, Johns Hopkins Medicine physicians falsely claimed to have performed certain services, including new patient/new problem office visits.  As a result, Defendants knowingly and improperly billed Medicare and other federal health care programs for services rendered to new patients/new problems by NPPs as if those services were rendered by physicians.

208.   Further, throughout the relevant time period, Johns Hopkins Medicine physicians falsely claimed to have performed certain gastrointestinal diagnostic tests and procedures.  As a result, Defendants knowingly and improperly billed Medicare, Medicaid and other federal health care programs for these diagnostic tests and procedures.

209.   Through these acts, Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).  Such claims caused actual damages to the United States.

210.   Further, through these acts, Defendant knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to the United

69

States in violation of 31 U.S.C. § 3729(a)(1)(B).  Such claims caused actual damages to the United States.

## COUNT II
### Maryland False Health Claims Act
### Md. Code Ann., Health-General §§ 2-602(a)(1)-(2)

211.    Relator re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein and further allege as follows:

212.    Throughout the relevant time period, Johns Hopkins Medicine physicians falsely claimed to have performed certain gastrointestinal diagnostic tests and procedures. Further, Defendants knowingly and improperly billed Medicaid for these diagnostic tests and procedures.

213.    Through these acts, Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment to the State of Maryland in violation of Md. Code Ann., Health-General § 2-602(a)(1).  Such claims caused actual damages to Maryland.

214.    Further, through these acts, Defendant knowingly made or used, or caused the making or use of, false records or statements material to false or fraudulent claims to the State of Maryland in violation of Md. Code Ann., Health-General § 2-602(a)(2).  Such claims caused actual damages to Maryland.

## REQUESTS FOR RELIEF

215.    WHEREFORE, Relator demands that judgment be entered in her favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.

216.    This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, and any other recoveries or relief provided for under the Federal

False Claims Act.

217.    This Request also includes, with respect to the Maryland False Health Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Ten Thousand Dollars ($10,000.00) for each false claim, and any other recoveries or relief provided for under the Act.

218.    This Request also includes all relief and other recoveries provided for under Section 2-607(a) of the Maryland False Health Claims Act.

219.    Further, Relator requests that she receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and Maryland, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs.  Relator request that their award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Respectfully submitted,

_____
David A. Branch #22862
Law Office of David A. Branch and Associates, PLLC
1828 L Street, NW
Suite 820
Washington, D.C. 20036
(202) 785.2805 phone
(202) 785.0289 fax
davidbranch@dbranchlaw.com